# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 6, 2001 Session

## JOHN DAVID TERRY  v.  STATE OF TENNESSEE

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 87-S-975     Hon. Randall Wyatt, Jr., Judge**

---

### No. M1999-00191-SC-DDT-DD - Filed April 25, 2001

---

The defendant was first convicted of premeditated first degree murder and arson in 1989.  The jury found two statutory aggravating circumstances: (1) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (2) that the murder was committed while the defendant was engaged in committing a larceny.  Finding that the aggravating circumstances outweighed the mitigating circumstances, the jury sentenced the defendant to death by electrocution.  This Court granted a new sentencing hearing after determining that the trial court had erroneously charged the jury that the murder was committed while the defendant was committing a larceny.  In 1997, a jury again sentenced the defendant to death, finding that (1) the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind, and (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant. The Court of Criminal Appeals affirmed.  On automatic appeal, we affirm and hold that: (1) no prosecutorial misconduct occurred when the prosecutor asked the jury to consider certain facts and circumstances when weighing statutory aggravating circumstances against mitigating evidence; (2) the trial court did not err in allowing the jury to consider relevant facts and circumstances tending to establish aggravating circumstances or to rebut mitigating circumstances; (3) the evidence is sufficient to support a finding that the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind; (4) the evidence is sufficient to support a finding that the defendant committed murder to avoid lawful arrest or prosecution; and (5) the sentence of death is not disproportionate to the sentence imposed in similar cases.  For all other issues not specifically discussed in this opinion, we agree with and affirm the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal;**
**Judgment of the Court of Criminal Appeals Affirmed**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and FRANK F. DROWOTA, III, and JANICE M. HOLDER, JJ., joined.  ADOLPHO A. BIRCH, JR., J., filed a dissenting opinion.

Brock Mehler and Michael E. Terry, Nashville, Tennessee, for the appellant, John David Terry.

Michael E. Moore, Solicitor General; Tonya G. Miner, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

On June 15, 1987, the defendant, John David Terry, shot and killed church handyman James Matheney and was sentenced to death in 1989. This Court remanded the case for resentencing after determining that the trial court erred in charging the jury the aggravating circumstance that the murder was committed while the defendant was engaged in committing a larceny.[1] The resentencing hearing was conducted in August 1997, and the jury again returned a verdict of death based upon its finding of two aggravating circumstances. The case is now before us on appeal from that judgment.

The events giving rise to the murder occurred predominantly in March of 1987. At that time, the defendant was the Associate Bishop Overseer of the Emmanuel Churches of Christ, a centrally organized governing body of local churches. He was also the pastor of one of those local churches–the Woodland Street Church–in Nashville. For several years, the defendant believed that the current Bishop Overseer would retire at the age of 65, and that he would be appointed the next Bishop. In March 1987, however, his expectations were disappointed when the Bishop announced that he was not going to resign. The defendant testified that soon thereafter, he became overwhelmed by the sense that he had failed in life, and he began to contemplate suicide. However, he ultimately pursued a plan to stage his death and assume a new identity.

In furtherance of his plan, the defendant, who had been misappropriating church funds since 1984, began to withdraw large sums of money from the church account. He withdrew five thousand dollars to purchase a motorcycle and another ten thousand dollars to keep in cash. In April, the defendant ordered several books advertised in *Soldier of Fortune* magazine to learn how to change his identity. Based on the information he read in these books, he randomly searched the obituaries at the local library until he found the obituary of seven-year-old drowning victim, Jerry Milam, whose birth date was similar to that of the defendant. He obtained a copy of Jerry Milam's birth

---

[1] The defendant was originally convicted of first degree murder and arson in 1989. The jury sentenced the defendant to death after finding that the State had proven the existence of two aggravating circumstances beyond a reasonable doubt: (1) the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind, Tenn. Code Ann. § 39-2-203(i)(5) (1982); and (2) the murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit larceny, Tenn. Code Ann. § 39-2-203(i)(7) (1982). The defendant filed a motion for a new trial and for a new sentencing hearing. The trial court denied the motion for a new trial on the issue of guilt or innocence; however, the trial court found that it had erroneously charged to the jury the (i)(7) aggravating circumstance, and therefore, it granted a new sentencing hearing. The State appealed; we affirmed the trial court's decision in State v. Terry, 813 S.W.2d 420 (Tenn. 1991).

certificate and forged a copy of a baptismal certificate. Using these documents, the defendant was able to get a driver's license, a social security number, a fictitious mailing address, and the title to the purchased motorcycle–all in the name of Jerry Milam.

The defendant also made concerted efforts to befriend the victim, James Matheney, whose ex-wife, Teresa Seagraves, was a parishioner at the defendant's church. The defendant testified that he had wanted to incorporate Mr. Matheney into his plan to disappear by staging "some kind of a hoax or some kind of robbery and have . . . [Mr. Matheney] be the one that would come in and . . . find blood or find some kind of robbery attempt."[2] Accordingly, he spent time fostering a relationship with Mr. Matheney by counseling him through some personal problems, hiring the unemployed Mr. Matheney as the church's second handyman, and renting an apartment for him, paying the first six weeks' rent.

On the day of the murder, the defendant and Mr. Matheney prepared to set out on a fishing trip lasting for several days. That morning, the defendant picked up Mr. Matheney at his apartment and drove to the church. He testified that he gave Mr. Matheney the keys to his car and his credit card to buy gasoline for his car while he returned phone calls made to the church.

The defendant stated that approximately thirty minutes later, he heard someone come into the church. When he went to investigate, he noticed that the fold-down stairwell leading up to the church attic had been lowered. He climbed the stairs, saw James Matheney, and shot him in the "side of the back of the head" with a .38 caliber pistol.[3]

He later cut off the victim's head and right forearm.[4] After undressing the victim down to his underwear and putting his own belt around the victim's waist, he placed the clothes in one sack and the body parts in another sack. Leaving the body up in the attic, he drove off in his car to first dump the bag containing the victim's clothes, the hacksaw, and the knife used to dismember the body, into a dumpster. Thereafter, he purhased two five-gallon cans, which he filled with gasoline. He loaded them in the car and drove to a "mini-warehouse" where his motorcycle was hidden. Leaving the bag of body parts there, he then drove back to the church to drop off the gasoline cans.

From there, the defendant drove to the boarding house where the victim had been renting a room. He parked his car a few streets away, walked over to the house, and placed his own wallet

---

[2] The record reflects that Mr. Matheney was approximately the same size as the defendant and often wore the defendant's clothing.

[3] On cross-examination, the defendant testified that he had, some two or three weeks prior, hidden a duffel bag containing the gun and some getaway clothes in the attic. However, the record is unclear why Mr. Matheney went into the attic in the first place. On cross-examination, the prosecutor alluded to the fact that the defendant purposely sent him upstairs to perform some maintenance work; the defendant denied such an allegation.

[4] Although the defendant testified that he had waited between one and two hours before removing parts of the body, medical examiner Dr. Charles Warren Harlan, who conducted the autopsy on the victim's body, testified that the removal of these body parts could have occurred as soon as ten to fifteen minutes after the time of death.

in the front room area. He then took a taxi back to the warehouse, leaving his car parked near the boarding house. Inside his car he left the following items: a beer bottle; a towel smeared with the defendant's own blood that he had withdrawn the previous night; some of the defendant's credit cards; and the victim's tackle box, rod, and reel. The defendant had placed the victim's fingerprints on the beer bottle and credit cards by taking the victim's severed forearm and applying the hand to these items.

Back at the warehouse, he then proceeded on motorcycle, taking the bag of body parts with him, to Kentucky Lake where he rented a boat. Once on the lake, the defendant tied a weight of some sort to this bag and dropped it into the water. He returned to the church after dark, and, according to his testimony, he removed tattooed pieces of flesh from each of the victim's arms, flushing the pieces down the toilet. Finally, he wrapped the body in a carpet, placed chopped wood in the attic, and then doused the church with gasoline. After one false start, the defendant finally set the church ablaze during the early morning hours of Tuesday, June 16, 1987.

Later that day, the defendant traveled to Memphis and paid cash for a two-night stay in a motel. He only stayed the first night, during which he entertained himself by attending a Double A baseball game. The following day, June 17, he threw his .38 caliber pistol into the Mississippi river and called his lawyer. He testified that he "just knew that [he] was in trouble . . . that [he] had killed somebody." He then drove back home to Nashville to turn himself in for the murder.

Meanwhile, the fire department officials conducted a search of the burned church and discovered the body wrapped in a carpet. Medical examiner Dr. Charles Harlan, who conducted the autopsy on the victim's body, testified that the decapitation, the amputation of the right forearm, and the excisions of skin from both shoulders all occurred after the victim's death. However, he further testified that "the cause of death [was] not present in the dismembered body, [but was] located somewhere within the head." His examination at the Forensic Science Center revealed that the head

> was very neatly cut all the way across any flesh area. It was just as smooth as if a steak were to be fileted. . . . When it came to the bone in the back–through the vertebra in the back, then those areas were–had real distinct saw marks . . . . The right arm was cut just below the elbow. It also was obvious that it was cut very straight, very neat, until it got to the bone portion and it was a sawing and grains going across the bone that were obvious to my eye.

On June 18, 1987, police apprehended the defendant. Detective Robert Moore testified that the defendant's demeanor upon arrest was "very matter of fact," not demonstrating any emotion whatsoever. Although the defendant was cooperative, Sergeant Moore explained, "I guess I was looking for some remorse or some signs. After being involved in a three day manhunt, like we had, I expected an awful lot more than what I saw. But I saw nothing but just plain straight up–just no sign of emotion at all."

The State also presented the testimony of Bishop Ronald Banks. Bishop Banks described in general the organization of the Emmanuel Churches of Christ, the financial structure of the church as a whole, the responsibilities of the Bishop and Assistant Bishop Overseer, and the role of a pastor for a local congregation. According to Bishop Banks, David Terry, as the pastor of a local church, had ultimate control over all business matters, the theological doctrine, and any administrative matters concerning his individual church; however, he was required to abide by the rules and bylaws of the church organization. He failed to follow church rules when he deposited the proceeds of the sale of some church property into the tithing account, from which he was required to draw his salary, instead of into the general fund of the church. Moreover, the defendant's withdrawal of money in excess of his salary was in direct violation of church rules.

In mitigation of the sentence, the defense presented testimony from some members of the defendant's family, former parishioners, prison personnel, and the defendant himself. The testimony from the defendant's deceased father, John Calvin Terry, recorded from a previous proceeding, was read to the jury. Mr. Terry, Sr., explained how he and his son worked together in the ministry and further testified to his son's devotion to his family and to his ministry. Rita Kemp, a member of the Emmanuel Churches of Christ, described how the defendant, of his own volition, visited her ailing father each time he was admitted to the hospital. She stated that her father always felt uplifted by the defendant's prayers and seemed comforted after his visits. Fellow prison inmate Michael Whitsey testified that the defendant helped him turn his life around through prayer sessions and bible study while they were both incarcerated.

Mr. Frank Bainbridge, an ordained deacon in the Catholic Church, testified that he holds ecumenical nondenominational Christian services in prison. After meeting the defendant in 1990, he has maintained a steady relationship with the defendant. He testified that the defendant often appears "terribly depressed [and] guilt-ridden about what had happened."

The defendant's brother, Fred Russell Terry, maintained that the defendant, as a child, was one who never caused any trouble or problems but was well-loved by everyone. He testified to the defendant's "total commitment" to the "church, family, mom and dad, his family, our family." However, he noticed a change in his brother's disposition when, in early 1987, he visited the defendant and found him to appear "troubled, maybe from the stress of the church or stress from something." The defendant's wife, Brenda Terry, also testified as to his changing behavior during the period between 1984 and 1987. She stated that he initially experienced intense mood swings and, over time, he became very withdrawn. Moreover, she testified that during that time, he had difficulty sleeping, he was gaining weight, and he was unable to perform sexually.

Dr. Robert Begtrup, a retired psychiatrist, who had originally evaluated the defendant's competency to stand trial, testified that although the defendant was not insane at the time of the offense and was legally competent to stand trial, the defendant was suffering from major depression when he committed the murder. Dr. Begtrup characterized the defendant's depression as a serious mental illness. He testified that the defendant's problem probably started four years prior with the

-5-

death of his mother, with whom he was very close and who he regarded as his "only confidante." Dr. Begtrup found that the defendant had never recovered from his mother's death.

The defendant testified on his own behalf. He described his disappointment when the Bishop refused to retire, his subsequent feelings of inadequacy and lack of control over his life, and his attempts to commit suicide. The defendant conceded that he contemplated killing James Matheney before the date of the incident and expressed his sorrow and remorse over "the worst thing that [he had] ever done."

The defense also presented other witnesses who testified that the defendant frequently helped others while he was incarcerated by holding prayer sessions, bible study, and otherwise counseling his fellow inmates. Several witnesses described the defendant as a model prisoner, a model employee in the prison's data processing unit, and a regular participant in worship services at the prison.

At the close of the proof, the jury was instructed on the following statutory aggravating factors: (1) the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind; and (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant for his underlying crime of embezzlement of church funds. The jury was also instructed to consider the following non-exclusive list of mitigating circumstances:

(1) The defendant has no significant history of prior criminal activity.

(2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(3) Prior to the commission of the murder, the defendant had been a positive and contributing member of the community, as a caring pastor, husband, and parent.

(4) The defendant has accepted responsibility for his crime and has exhibited remorse.

(5) For the last ten (10) years, the defendant has exhibited a serious and consistent effort to rehabilitate himself, by functioning at a high level within the limits of his confinement.

(6) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication[,] which was insufficient to establish a defense to the crime but which substantially affect[ed] his judgment.

(7) Any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The jury found that the State proved the two statutory aggravating circumstances beyond a reasonable doubt, and that these two aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.[5] Consequently, on August 6, 1997, the defendant was again sentenced to death. The trial court entered a judgment in accordance with the jury's verdict, and the Court of Criminal Appeals later affirmed the sentence.

The case was automatically docketed in this Court for review of the death sentence.[6] After considering the record in this case, this Court requested additional briefing and argument on the following issues: (1) whether the prosecutor presented non-statutory aggravating circumstances to be weighed against the mitigating evidence, and if so, whether such error adversely affected the sentence; (2) whether Tennessee Code Annotated section 39-13-204 confines the jury to weighing only statutory aggravating circumstances against the mitigating evidence, and whether allowing the jury to consider a "myriad of factors" in deciding whether death is the appropriate punishment violates the defendant's federal right to due process of law; (3) whether Tennessee Code Annotated section 39-2-203(i)(5) is unconstitutionally vague, and whether the evidence is sufficient to support the finding of the aggravator in this case; (4) whether the Tennessee Code Annotated section 39-2-203(i)(6) aggravating circumstance is unconstitutionally overbroad as applied, and whether the evidence is sufficient to support the finding of the aggravator in this case; and (5) whether the death sentence is an excessive and disproportionate punishment given the nature of the defendant and the circumstances of this case.

After reviewing the record and considering the issues raised by the defendant, we find no reversible error and affirm the judgment of the trial court and the judgment of the Court of Criminal Appeals.

**ANALYSIS**

---

[5] Because this offense occurred before the 1989 amendments to the capital sentencing statute, the trial court should not have instructed the jury regarding the weighing standard under the language of the amended statute. In State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994), we held that the legislature intended that sentencing hearings must be conducted in accordance with the law in effect at the time of the offense because the 1989 amendments contained no express or implied retroactivity clause. However, as the instructions required the jury to impose the death penalty on a higher standard of proof, any irregularity is harmless.

[6] See Tenn. Code Ann. § 39-13-206(a)(1) (1997) ("Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the court of criminal appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee supreme court.").

## I. *Prosecutorial Misconduct*

The defendant first contends that the State erred in its closing argument when it asked the jury to "consider in the balance," "weigh . . . in the balance," and "put in the balance" six "unique circumstances" against the mitigating proof. Specifically, the prosecutor listed the following factors on a handwritten chart for the jury to consider: (1) "extreme premeditation"; (2) "innocent victim"; (3) "brutality of murder"; (4) "violated private trust"; (5) "burning a church"; and (6) "concealment of crime." Next to these factors, the prosecutor then listed several of the mitigating factors in this case.

The defendant argues that the prosecution was improperly urging the jury to treat these "unique circumstances" in the same manner as aggravating circumstances, *i.e.*, as non-statutory aggravating circumstances to be weighed in the balance against the mitigating evidence. Although the defendant concedes that the prosecutor cautioned the jury that these six "unique circumstances" were not aggravating factors, his concern is that the State proceeded to treat those circumstances or factors as non-statutory aggravators by urging the jury to weigh them against the mitigating evidence. As a result, the defendant contends that the prosecutor engaged in misconduct that created a "'substantial risk that the death penalty [was] inflicted in an arbitrary or capricious manner,' *i.e.*, on the basis of factors other than those deemed by the legislature to be proper predicates for the sentencing determination." Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979) (quoting Gregg v. Georgia, 428 U.S. 188, 196 (1976)). In response, the State maintains that it was properly arguing facts and circumstances to establish and assign weight to the two statutory aggravating circumstances.

This Court has long recognized that closing arguments are a valuable privilege that should not be unduly restricted. See State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978) (citing Smith v. State, 527 S.W.2d 737 (Tenn. 1975)). Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion. Id. In a capital sentencing hearing, evidence may be presented tending to establish or rebut any statutory aggravating circumstances or mitigating circumstances. Moreover, a jury must be permitted to consider evidence pertaining to the nature and circumstances of the crime even if the proof is not necessarily related to a statutory aggravating circumstance. State v. Nesbit, 978 S.W.2d 872, 890 (Tenn. 1998). However, the State may not rely upon *non-statutory aggravating circumstances* in seeking the imposition of the death penalty. See id.; see also State v. Thompson, 768 S.W.2d 239, 251 (Tenn. 1989).

At the time of the defendant's offense, Tennessee's capital sentencing procedure required the jury to make two separate determinations before imposing a sentence of death: (1) that the State has proven at least one statutory aggravating circumstance beyond a reasonable doubt; and (2) that the proven statutory aggravating circumstance(s) outweigh any mitigating circumstances. Tenn. Code Ann. § 39-13-204(g)(1). Therefore, in determining whether death is the appropriate punishment for the offense and for the individual defendant, the jury is free to consider "a myriad of factors" relevant

to punishment, that is, relevant to establishing and assigning weight to aggravating and mitigating circumstances.  Nesbit, 978 S.W.2d at 890.  This "myriad of factors" serves to individualize the sentence imposed on each defendant to insure that the sentence is just and appropriate considering the characteristics of the defendant and the circumstances of the crime.  See Zant v. Stephens, 462 U.S. 875, 879 (1983).  Evidence appropriate for the jury's consideration can include the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances; and any evidence tending to establish or rebut any mitigating factors.  Tenn. Code Ann. § 39-13-204(c).

We have examined the record in light of the defendant's claims and find that the State's argument concerning "unique circumstances" was not improper for two reasons.  First, the six factors were within the realm of permissible evidence contemplated by the statute.  Second, after reviewing the closing argument as a whole, we conclude that the prosecutor properly offered these "unique circumstances" as specific evidence to support and give weight to the two statutory aggravating circumstances: (1) that the murder was heinous, atrocious, or cruel in that it involved depravity of mind, Tenn. Code Ann. § 39-2-203(i)(5); and (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant, Tenn. Code Ann. § 39-2-203(i)(6).

The record reflects that the prosecutor began his closing argument by introducing the two statutory aggravating circumstances to be established and by informing the jury that it had to find that at least one of them had been proven beyond a reasonable doubt before considering a sentence of death.  Specifically, the prosecutor stated:

> We've talked about your duties as jurors.  And the Judge is going to get very specific with you.  But, basically, it's like there's two charges here that we have to prove beyond a reasonable doubt.  You have to find at least one of them before you go to the next part of your consideration.  Have we proved this was heinous, atrocious, or cruel? Have we proved the defendant murdered James Matheney as part of the plan to avoid being prosecuted?

The prosecutor then prefaced his discussion of the evidence tending to establish these two aggravating circumstances as follows:

> Now, when you analyze and balance and you talk all about this, individually, and now, collectively, and the Judge will give you more instructions about that, these two Aggravating Factors, if you decide that one of them has been proven beyond a reasonable doubt, then you have to balance them against anything favorable to the defendant that's been introduced.  They're called Mitigating Factors.  And how do you balance them?

> Well, there are murders and there are murders.  You can kill someone to avoid an arrest by driving by in a car and shooting them, no thought, no planning.

But that's not exactly the same thing we have here. Every case is different. Every case depends on its facts. So it's the facts, Ladies and Gentlemen, that decides how important, how serious, how bad this crime is.

Well, let me show you some of the facts, some of [the] things that I think you should consider in the balance, on how important, how weighty what he did or things that make it bad. These are not Aggravating Factors, but they are evidence that make this crime more serious.

The defendant argues that urging the jury to consider some of the facts in the balance was "prosecutorial sleight of hand" for treating the specific facts, or "unique circumstances," in the same manner as aggravating circumstances, *i.e.*, to be weighed in the balance against mitigating evidence. Although the prosecutor did approach the line of impermissible conduct in his argument, we find that the trial judge did not err in failing to restrict the prosecutor's line of argument. The complained of portion of the closing argument, when viewed in context with the prosecutor's argument as a whole, reveals that the prosecutor first, properly identified the two aggravating circumstances to be proven, and second, offered six factors to establish or give weight to these aggravating circumstances.

Even assuming that the prosecutor approached the line of impermissible conduct, any adverse effects from his closing argument were erased by the trial court's instructions to the jury as to its role in considering the evidence. Specifically, the trial judge first instructed the jury that it could only consider the two statutory aggravating circumstances presented by the State as the basis for determining whether the death penalty would be appropriate in this case. The jury was then told that it had to unanimously find that the State had proven at least one of the two aggravators beyond a reasonable doubt before considering a penalty of death; only upon this unanimous determination could the jury then consider mitigating evidence. The trial court explained, "If you conclude that any evidence supports a mitigating circumstance or circumstances, then you should consider that mitigating circumstance or circumstances to be established, and then determine the weight to which it is entitled." Finally, the trial court instructed the jury that if it unanimously found that the aggravators outweighed any mitigating circumstances, the jury shall impose a sentence of death.

It is a well-established presumption in law that jurors are deemed to have followed the instructions given by the court, Nesbit, 978 S.W.2d at 894, and we see no evidence from the record to rebut this presumption. In fact, the record reflects that after the verdict was read, each juror was polled to determine whether that individual imposed a sentence of death in accordance with the trial court's instructions. The record indicates that all twelve jurors, individually and collectively, imposed the death penalty after finding first, that the two statutory aggravating circumstances were proven beyond a reasonable doubt, and second, that the aggravators outweighed the mitigating circumstances.

Therefore, after carefully reviewing the record, we simply do not find evidence that the jury was presented with non-statutory aggravating circumstances to be weighed against mitigating circumstances. Rather, the jury was properly asked to consider certain facts and circumstances of

-10-

the offense establishing and giving weight to the existence of the two aggravating circumstances. Accordingly, we hold that the prosecutorial argument was not improper, and therefore, this issue is without merit.

## *II.* *Consideration of Non-Statutory Aggravating Factors*

The defendant continues to argue that the trial court erred in allowing the jury to consider and weigh non-statutory aggravating circumstances as a basis for imposing the death penalty, thereby violating the defendant's constitutional rights. As we have previously discussed at length, the prosecutor clearly explained to the jury that the State sought to prove only two statutory aggravating circumstances. All evidence presented served only to establish and give weight to these aggravators. Because we hold that the State did not advance non-statutory aggravating circumstances, this issue is without merit.

## *III.* *Heinous, Atrocious, or Cruel Aggravating Circumstance (i)(5)*

The defendant also challenges the application of the statutory "heinous, atrocious, or cruel" aggravating circumstance. At the time of the offense, this aggravator, set out in Tennessee Code Annotated section 39-2-203(i)(5) (1982), provided that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind."[7] The defendant, citing as authority the decisions in Houston v. Dutton, 50 F.3d 381 (6th Cir. 1995), and Coe v. Bell, 161 F.3d 320, 332-33 (6th Cir. 1998), asserts that the definitions of "heinous," "atrocious," and "cruel" are unconstitutionally vague and that the modifier "torture or depravity of mind" does not serve to cure this problem of vagueness.

The role of the aggravating circumstance is to "circumscribe the class of persons eligible for the death penalty." See Barclay v. Florida, 463 U.S. 939, 952-56 (1983); Zant, 462 U.S. at 877-78. Statutory aggravating circumstances are constitutional if they meet two requirements: "'First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.'" Carter v. Bell, 218 F.3d 581, 607 (6th Cir. 2000) (quoting Tuilaepa v. California, 512 U.S. 967, 972 (1994)). Therefore, the nature of the aggravator must be sufficiently definite so as to prevent arbitrary or discriminatory imposition of death.

We have consistently upheld the constitutionality of this pre-1989 aggravating circumstance, and we have rejected the argument that the terms are vague or overbroad. See Strouth v. State, 999 S.W.2d 759, 764 (Tenn. 1999); State v. Middlebrooks, 995 S.W.2d 550, 555-56 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 280 (Tenn. 1998); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989). In State v. Williams, 690 S.W.2d 517, 527-30 (Tenn. 1985), we examined the language of the (i)(5) aggravating circumstance and clarified its application by defining each term according to

---

[7] Application of this pre-1989 version of the (i)(5) aggravating circumstance is proper as the offense was committed in 1987. See State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994).

its ordinary and natural meaning. The trial court in this case used the definitions set forth in Williams in its instructions to the jury:

> "Heinous" means grossly wicked or reprehensible; abominable; odious; vile.
> "Atrocious" means extremely evil or cruel, monstrous, exceptionally bad, abominable.
> "Cruel" means disposed to inflict pain or suffering; causing suffering; painful.
> "Depravity" means moral corruption, wicked or perverse act.[8]

We continue to reject the claim that this aggravating circumstance is vague or overbroad. Furthermore, we conclude that the defendant's reliance on Houston v. Dutton and Coe v. Bell, Sixth Circuit habeas corpus decisions holding the (i)(5) aggravating circumstance unconstitutionally vague, is misplaced. In Middlebrooks, we recognized that the trial courts in those cases either failed to define the terms in their instructions to the jury or provided only incomplete definitions of the terms.[9] Middlebrooks, 995 S.W.2d at 557. This was not the situation in this case. Moreover, and more importantly, this Court is not bound by federal court decisions other than those of the United States Supreme Court, id. (citing State v. McKay, 680 S.W.2d 447, 450 (Tenn. 1984)), which has not yet held this aggravating circumstance unconstitutional. Therefore, for the foregoing reasons, we hold that the (i)(5) aggravating circumstance is sufficiently definite so as to prevent arbitrary or discriminatory imposition of the death sentence.

The defendant next contends that the evidence is insufficient to support the jury's finding that this murder involved "depravity of mind." When the sufficiency of the evidence supporting an aggravating circumstance is challenged, the appellate court must determine whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. See State v. Nesbit, 978 S.W.2d 872, 886 (Tenn. 1998); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

The evidence demonstrates that the defendant had devised an elaborate scheme to simulate his own death and then disappear under an assumed identity. His plan involved murdering an individual similar in size to himself and dismembering the corpse to remove identifiable body parts so as to make the body appear to be his own. Consequently, the defendant selected James Matheney,

---

[8] The trial court correctly deleted "torture" from the instruction, as both parties concede that the evidence does not support a finding that the murder involved torture. See State v. Van Tran, 864 S.W.2d 465, 478-79 (Tenn. 1993) (citing State v. Pritchett, 621 S.W.2d 127, 139-40 (Tenn. 1981) (holding that a trial court should charge only those aspects of an aggravating circumstance supported by the evidence in a case)).

[9] In Houston v. Dutton, the whole instruction given to the jury regarding the "heinous, atrocious, or cruel" aggravating circumstance was as follows: "The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Houston, 50 F.3d at 387. The federal court found the trial court's jury instruction to be constitutional error. Similarly, in Coe v. Bell, the federal court again found the trial court's jury instructions constitutionally infirm in that they were incomplete. Charging all aspects of this aggravator, the trial court only provided definitions for the terms "heinous," "atrocious," and "cruel" and did not define "torture" or "depravity of mind." Coe, 161 F.3d at 333.

who was approximately the same size and often wore the defendant's clothes. For months, he worked to foster a close relationship with the victim. Using his position as pastor, he counseled the victim, employed him, found and paid for his housing, and eventually earned his trust and friendship. At the same time, he was hiding weapons at the scene of the crime in preparation for the murder. Finally, on the pretense of taking the victim on a fishing trip, the defendant shot and killed the victim at his own church. After examining the record, we conclude that this extensive plan to single out the victim for execution illustrates the "wickedness" and "perverseness" of the murder and is evidence from which a rational jury could infer the defendant's depraved mind at the time he fatally shot the victim.

Moreover, the dismemberment of the corpse establishes depravity of mind in this case. The key inquiry is the defendant's state of mind at the time of the murder. In Williams, we held that if acts occurring after the death of the victim are relied upon to show the defendant's depravity of mind, then such acts must be shown to have occurred close to the time of the death to provide a rational basis for the trier of fact to infer that the defendant's state of mind at the time of the killing was depraved. Williams, 690 S.W.2d at 529-30. The defendant argues that the time factor propounded by Williams is too relative and uncertain a standard for distinguishing those persons eligible for the death penalty. However, the time factor merely assists in directly relating the post-mortem mutilation to the commission of the murder, thereby establishing the defendant's depravity of mind at the time of the murder. As the Court of Criminal Appeals reasoned in this case, any dismemberment of a corpse can establish depravity of mind if the acts can be considered "incident to the murder and not . . . separate, distinct or independent from it."

Viewing the evidence in the light most favorable to the State, the record demonstrates that the defendant dismembered the victim's body as soon as fifteen minutes to one hour after the victim's death. Additionally, the defendant concedes that the murder was committed to simulate his own death, and that the dismemberment of identifying body parts was required to conceal the victim's identity. Specifically, the defendant decapitated the body and removed a forearm; bagged the body parts and disposed of them in a lake; sliced off pieces of tattooed flesh and flushed them down the toilet; and finally, set fire to his own church to burn the body beyond all recognition. We conclude that the defendant's post-mortem acts occurred in close temporal proximity to the victim's death, were incident to the murder as part of a plan, and were of such a despicable nature that a rational jury could easily infer the defendant's depraved mind at the time of the murder.

Accordingly, after reviewing the evidence in the light most favorable to the State, we hold that the evidence is more than sufficient for any rational trier of fact to find, beyond a reasonable doubt, that the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind.

### IV. *Murder to Prevent Arrest Aggravating Circumstance (i)(6)*

The next issue is whether the (i)(6) aggravating circumstance was supported by the evidence in this case. This aggravating circumstance provides that "[t]he murder was committed for the

purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-2-203(i)(6) (1982). At the sentencing hearing, the State theorized that the defendant killed the victim as part of his plan to avoid arrest or prosecution for his embezzlement of church funds. The defendant argues that this case presents a novel factual situation in which the murder did not involve a victim of, or a witness to, another crime, but rather, it involved an unsuspecting individual completely unaffiliated with the defendant's underlying crime of embezzlement. Thus, the defendant asserts, the evidence does not support the finding that this murder was committed to avoid arrest or prosecution for the embezzlement of church funds. In response, the State argues that this aggravator does not require that the murder victim know or be able to identify the defendant. Thus, the State argues, the aggravator was appropriately applied to the evidence in this case.

Again, we reiterate that the purpose of legislatively defined aggravating circumstances is to effectively narrow the class of death-eligible defendants. "If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." See Arave v. Creech, 507 U.S. 463, 474 (1993). We have held that the language of this aggravator is sufficiently clear to put defendants on notice of what homicides are punishable by death. See State v. McCormick, 778 S.W.2d 48, 53 (Tenn. 1989). Moreover, this statute is sufficiently definite to inform the jury of the evidence to be proven before a death sentence may be imposed. Id.

The defendant insists that because the victim in this case was not the victim of the defendant's crime of embezzlement, nor a witness to this crime, nor even a law enforcement officer attempting to arrest the defendant for the underlying crime, this aggravator may not be applied. We have previously held that this statute is not limited in its application to only these situations. See State v. Hall, 976 S.W.2d 121, 133 (Tenn. 1998) (refuting the notion that (i)(6) applies only when a victim knows or can identify the defendant). Rather, the focus must remain on the defendant's motives for committing the murder. See Hall, 976 S.W.2d at 133 (citing State v. Smith, 868 S.W.2d 561, 580 (Tenn. 1993)). We do not require that the desire to avoid arrest or prosecution be the sole motive for killing the victim. Instead, such a desire need only be one of the purposes motivating the defendant to kill. See State v. Carter, 714 S.W.2d 241, 250 (Tenn. 1986).

While the facts giving rise to the crime of embezzlement are undisputed,[10] there is also

---

[10] The record reflects that for several years prior to the murder, the defendant had committed a predicate crime, separate and distinct from the murder, of the embezzlement of church funds. The defendant testified that he first started "skimming money" out of the church's accounts in 1984. Although the evidence revealed that the pastor of a church had absolute control and discretion over all church accounts and in fact, was supposed to withdraw a salary from the church's tithe account, the defendant unlawfully withdrew sums of money in excess of his salary for his own personal use. He testified that in 1984, when he was considering resigning from the ministry, he used church money to pay for a commercial driver's course and to buy a van. In response to questioning, the defendant conceded that he "just used [the money] because it was available." He eventually admitted that he "stole" the money. In addition, in March 1987, the defendant deposited over $33,000 into either the church's tithe account or into his own personal account. Of this money, the defendant spent $5,000 on the purchase of the motorcycle used in leaving Nashville after the murder; he paid $15,000

(continued...)

-14-

evidence, when viewed in a light most favorable to the State, from which a reasonable jury could find that the defendant committed murder, at least in part, to prevent his apprehension for the theft. The record shows that the defendant painstakingly planned his escape to leave behind the "old David Terry" and start his life anew, under a new identity and indeed, with a new appearance such that he could remain "dead" forever. For several months, he purchased legal documents under a new name, purchased additional life insurance for the provision of his family, and carefully planned the murder itself to make it look like he died at the hands of James Matheney. Once the murder was committed, the defendant altered his appearance so as to avoid detection and possible apprehension. As Sergeant Moore testified,

> I had seen photographs . . . of John David Terry. . . [but] the person that I saw that morning, I had no idea who I was looking at. It was just a striking difference. . . . [H]is head was shaved, he had a dark tan, he was in casual khaki clothes and he just looked entirely different. I wouldn't have known him on the street.

The defendant testified that he had considered creating the illusion that he had been brutally kidnapped, or that he otherwise suffered some brutality before "disappearing," leaving only his bloodstains as evidence of his questionable demise. Given these circumstances, a reasonable jury could conclude that because of his desire to avoid arrest or prosecution for his theft, he decided, at least in part, to commit murder and leave behind a body, charred beyond all recognition, to prevent any investigation that would have inevitably occurred had he merely "disappeared." As the State aptly phrases the principle, "law enforcement officials do not look for dead men, and they are certainly not prosecuted." As the State theorized in its closing argument,

> He told you that he was thinking about committing suicide, but the evidence is not there to support it. The evidence is there to support that this man was going to selfishly leave his church, leave his family, steal the money, and start new somewhere else. There's no evidence to support that he was going to stick a gun in his mouth and pull the trigger like he told you he tried to do many times but simply couldn't do it. There's no evidence to support that, because he didn't have any qualms at all about pulling that trigger and shooting James Matheney.
>
> He's planning to leave because he's realized he stole the money, he's going to take out a big amount to plan his new life. But he has to leave behind the old David Terry so that he can't be prosecuted in his new life, so that he can't be found. So he plans the plan that you've heard about. He plans to murder James Matheney.
> . . . .
> . . . The murder was absolutely committed for no other reason other than for Mr. Terry to get away, to get away from the church and start a new life, because he'd been stealing. And he knew that he'd eventually get caught and would be prosecuted.

---

[10] (...continued)
to his attorney when he returned from Memphis; and he hid $10,400 in cash at his residence.

Examining the evidence in the light most favorable to the State, we hold that a rational jury could have concluded beyond a reasonable doubt that the defendant committed this murder, at least in part, to prevent his arrest for the separate crime of theft.

## V. *Proportionality Review*

We now conduct comparative proportionality review to determine whether the defendant's sentence of death for premeditated first degree murder "is disproportionate to the sentences imposed for similar crimes and similar defendants." State v. Bland, 958 S.W.2d 651, 664 (Tenn. 1997); see also Tenn. Code Ann. § 39-13-206(c)(1)(D) (requiring reviewing courts to determine whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant). The purpose of comparative proportionality review is to ensure that the death penalty is applied consistently and not arbitrarily or capriciously. The presumption is that a sentence of death is proportional to the crime of first degree murder, State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997), as long as sentencing procedures focus discretion on the "'particularized nature of the crime and the particularized characteristics of the individual defendant,'" McCleskey v. Kemp, 481 U.S. 279, 308 (1987) (quoting Gregg v. Georgia, 428 U.S. 153, 206 (1976)). Applying the precedent-seeking approach, we undertake to compare this case to other cases in which the defendants were convicted of the same or similar crimes. Bland, 958 S.W.2d at 664. We look at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved. Id. Because no two cases involve identical circumstances, our objective cannot be to limit our comparison to those cases where a defendant's death sentence "is perfectly symmetrical," but only "to identify and to invalidate the aberrant death sentence." Id. at 665.

In Bland and its progeny, we enumerated several nonexclusive factors relevant to the process of identifying and comparing similar cases. These include: (1) the means of death; (2) the manner of death (*e.g.*, violent or torturous); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances including age, race, and physical and mental conditions; and the victim's treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Id. at 667. Moreover, we have identified several nonexclusive factors relevant to the comparison of the characteristics of defendants: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of victim(s); (8) the defendant's capacity for rehabilitation.

Applying these factors, we note that the evidence in this case demonstrates that the victim was most likely shot in the back of the head. There is no evidence of provocation. At least one motivation for this killing was for the defendant to stage his death and escape into obscurity, thereby avoiding arrest or prosecution for his underlying crime of embezzlement. The defendant killed the

-16-

victim in his own church. The record indicates that the defendant had planned this murder for months. He ordered books to learn about how to change his identity and, using this information, he extensively researched obituaries at the library until he located a decedent whose identity he could easily adopt. Putting his plan into motion, he created or otherwise procured documents necessary to establishing his new identity. The defendant also carefully selected the murder victim–a man approximately the same size as himself–whose body would appear to be his own. For weeks prior to the murder, the defendant fostered a close relationship with the victim while simultaneously hiding weapons, clothes, and money taken from the church in anticipation of committing the murder and making a clean escape. Once the victim was dead, the defendant expertly dismembered the body and disposed of the body parts in a lake. After setting the church on fire, the defendant escaped to Memphis.

The defendant, a middle-aged Caucasian male, was the pastor of a local church and has no prior record of criminal activity. Although the defense presented expert proof that he suffered from major depression at the time of the murder, the proof also demonstrates that he did not suffer from such a severe mental illness so as not to understand the criminality of his acts. Moreover, the record reflects that upon arrest, the defendant, while cooperative with authorities, was devoid of any feelings of remorse. While incarcerated, however, the defendant has shown remorse and has demonstrated a continuous effort to rehabilitate himself by participating in religious activities, counseling fellow inmates, and working hard at his job in prison to send money on a monthly basis to his wife and daughter.

While the facts of this case are admittedly unique, our research nevertheless reveals several cases containing similar circumstances. In State v. Carter, 714 S.W.2d 241 (Tenn. 1986), the jury found that the defendant's motive for the murder was to kill the victim to avoid arrest for another crime. The defendant had been planning to steal an automobile and decided upon the victim's truck. The defendant shot the victim–a stranger to the defendant and completely unsuspecting of the impending crime–and disposed of the body in a lake in an attempt to conceal the murder and to avoid arrest. The jury imposed the sentence of death after finding the (i)(6) and (i)(7) aggravating circumstances beyond a reasonable doubt.

In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the death penalty was imposed and upheld for a forty-year-old defendant who murdered his estranged wife and two stepsons. Witnesses testified that for several months prior to the murder, the defendant had publicly plotted to kill his family. Expert testimony revealed that he mutilated two of the bodies shortly after the victims' deaths, and the jury concluded that the evidence was sufficient to support the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5). Moreover, the jury found that the proof supported a finding that at least one motive for killing the step-sons was the threat they posed of the defendant's apprehension. Tenn. Code Ann. § 39-2-203(i)(6).

In State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985), two victims died from gunshot wounds at the hand of the defendant. The defendant and the victims planned to meet at a designated location

in the woods and conduct a drug transaction; however, upon arriving at the meeting place, the victims were shot and their money stolen. The defendant also slit their throats and left them in the woods. Due to the advanced stage of decomposition of the bodies, the pathologist performing the autopsy was unable to tell whether the victims died before or after their throats had been cut. The jury found the evidence of the needless mutilation of the victims sufficient to infer that the defendant possessed a depraved state of mind at the time of the killings. Therefore, the jury imposed a sentence of death for each killing, finding that (1) the murders were committed by the defendant while he was engaged in robbing the victims, Tenn. Code Ann. § 39-2-203(i)(7); and (2) that the murders were especially heinous, atrocious, or cruel in that they involved torture or depravity of mind, Tenn. Code Ann. § 39-2-203(i)(5).

In State v. Bondurant, 4 S.W.3d 662 (Tenn. 1999), the defendant beat an unarmed and unsuspecting victim to death after a card game. The beatings continued for thirty minutes after the victim had died. Immediately thereafter, the defendant and his brother dismembered the victim's body, transported the pieces to their parents' home, and burned the corpse. Mitigating evidence portrayed the defendant as an exemplary son, a good family man, and a hard-working employee. The jury convicted the defendant of first degree premeditated murder and arson and sentenced the defendant to death; the defendant's convictions were reversed and the case remanded for a new trial on other grounds.

Moreover, the sentence of death has been affirmed in cases containing similar mitigating evidence. See State v. Burns, 979 S.W.2d 276 (Tenn. 1998) (upholding a death sentence in spite of evidence of the defendant's religious faith and involvement); State v. Pike, 978 S.W.2d 904 (Tenn. 1998) (upholding a death sentence even though defendant had no significant history of criminal activity and was apparently mentally disturbed at the time of the murder); State v. Hall, 958 S.W.2d 679 (Tenn. 1997) (upholding a death sentence even though defendant had no prior criminal record and had a personality disorder and severe emotional problems at the time of the murder).

We have also found one somewhat similar case in which the death penalty was not imposed. In State v. Harris, 989 S.W.2d 307 (Tenn. 1999), the jury found the defendant guilty of first degree murder and imposed a sentence of life imprisonment without the possibility of parole. The defendant and her friends had carjacked the victim's truck late one night. The victim started screaming for help. Afraid that someone would hear the screams, one of the defendant's friends shot and killed the victim. The group then took the body to a deserted area, dismembered it, and buried it. At trial, the defendant presented evidence that she suffered from psychological disorders, was chemically dependent, and had been abused as a child. A clinical psychologist opined that the defendant participated in the murder of the victim because she is dependent upon men and was following her boyfriend's directions that night. The State sought the death penalty upon the basis of the (i)(5) and (i)(6) aggravating circumstances. The jury, based upon the extensive mitigating proof and the fact that the defendant was not the actual killer, returned a verdict of life imprisonment.

Although the death penalty may be imposed for an offense involving circumstances similar to those of an offense in which only a sentence of life imprisonment is imposed, the death sentence

-18-

is not disproportionate if this Court can ascertain some basis for the imposition of the lesser sentence. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). We find several factors that distinguish Harris from the case at bar: the defendant's extensive mitigating evidence consisting of her psychological disorders, substance abuse, and traumatic childhood involving sexual abuse occurring at an early age; the fact that the defendant did not fire the shot that killed the victim; and finally, the absence of the extreme premeditation that occurred in this case. Nevertheless, even if this case could not be distinguished, "the isolated decision of a jury to afford mercy does not render a death sentence disproportionate." State v. Keen, 31 S.W.3d 196, 222 (Tenn. 2000).

The defendant argues that his situation is unique because, unlike the defendants in these other cases, he had selflessly served the community for many years prior to suffering a mental breakdown. Although the exact combination of facts and circumstances in this case is not replicated in our comparative pool of similar cases, no two cases are identical. Indeed, we have identified cases involving circumstances similar to the crime in this case, *i.e.*, extreme premeditation, an unarmed victim, mutilation of the victim's body, and concealment of the crime to avoid detection and arrest. Furthermore, we have identified cases containing similar mitigating evidence, *i.e.*, lack of prior criminal history, existence of mental illness, and involvement in religious activities. Based on our review of these cases in which the death penalty was upheld, we conclude that the defendant's case, taken as a whole, is not plainly lacking in circumstances that have previously justified death sentences. Accordingly, we conclude that the death sentence imposed for the premeditated murder of victim James Matheney was neither disproportionate to the penalty imposed in similar cases, nor arbitrarily applied.

**CONCLUSION**

In conclusion, we have carefully reviewed the record, and, based on the facts and circumstances of this case, we have determined that the defendant's allegations of error are without merit. There exists no evidence of prosecutorial misconduct; the evidence is sufficient to support the jury's finding of two statutory aggravating circumstances beyond a reasonable doubt; and the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating evidence beyond a reasonable doubt. With respect to issues not specifically addressed in this opinion, we agree with and affirm the decision of the Court of Criminal Appeals, authored by Judge David G. Hayes and joined by Judges David H. Welles and Norma McGee Ogle. Relevant portions of that opinion are attached as an appendix.

Therefore, we hold that the sentence of death was neither disproportionate, nor arbitrarily applied. The conviction and sentence of John David Terry is affirmed and shall be carried out on the 17th day of October, 2001, unless otherwise ordered by this Court or proper authority. As the record reflects that the defendant is indigent, costs of this appeal are assessed against the State of Tennessee.

_____
WILLIAM M. BARKER, JUSTICE

**APPENDIX**


**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**
**AT NASHVILLE**
**FEBRUARY SESSION, 2000**


| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | **No. M1999-00191-CCA-R3-DD** |
| **Appellee,** | ) | |
| | ) | **DAVIDSON COUNTY** |
| **vs.** | ) | |
| | ) | **Hon. J. Randall Wyatt, Jr., Judge** |
| **JOHN DAVID TERRY,** | ) | |
| | ) | **(Premeditated First Degree** |
| **Appellant.** | ) | **Murder)** |


For the Appellant:                             For the Appellee:


**Brock Mehler**                                   **Michael E. Moore**
Attorney for Appellant                       Solicitor General
751 Roycroft Place
Nashville, TN 37203                          **Tonya G. Miner**
                                                          Assistant Attorney General
                                                          Criminal Justice Division
                                                          425 Fifth Avenue North
**Michael E. Terry**                             2d Floor, Cordell Hull Building
Attorney for Appellant                       Nashville, TN 37243-0493
Suite 310 Cummins Station
209 10th Ave. So.
Nashville, TN  37203                          **Victor S. (Torry) Johnson III**
                                                          District Attorney General

                                                          **John Zimmerman**
                                                          Asst. District Attorney General
                                                          Washington Sq., Suite 500
                                                          222-2nd Ave. N
                                                          Nashville, TN  37201-1649

OPINION FILED: _____

AFFIRMED

**David G. Hayes,** Judge

**OPINION**

The appellant, John David Terry, appeals as of right, his punishment of death by electrocution. In 1989, the appellant was convicted by a Davidson County jury of the premeditated murder of James Matheney and was sentenced to death. At the motion for new trial, the trial court affirmed the appellant's conviction but, finding that it had erroneously charged an invalid aggravating circumstance, granted a new sentencing hearing.[1] The State appealed this decision and our supreme court affirmed the action of the trial court.[2] See State v. Terry, 813 S.W.2d 420 (Tenn. 1991). The appellant's case was remanded to the Criminal Court of Davidson County for re-sentencing. At the conclusion of the re-sentencing hearing in August 1997, the jury found the presence of two aggravating circumstances, *i.e.*, (1) that the murder was especially heinous, atrocious or cruel, Tenn. Code Ann. § 39-2-203(i)(5) (1982) (*repealed* 1989), and (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution, Tenn. Code Ann. § 39-2-203(i)(6).[3] The jury further determined that the mitigating circumstances did not outweigh the aggravating circumstances and imposed a sentence of death by electrocution. The trial court approved the sentencing verdict. The appellant appeals presenting for our review the following issues:

I. Whether the heinous, atrocious, cruel aggravating circumstance, Tenn. Code Ann. § 39-2-203(i)(5), is unconstitutionally vague;

II. Whether the evidence is sufficient to support application of the heinous, atrocious, cruel aggravating circumstance, Tenn. Code Ann. § 39-2-203(i)(5);

III. Whether Tenn. Code Ann. § 39-2-203(i)(6), murder perpetrated to avoid prosecution, is unconstitutionally vague;

IV. Whether the evidence is sufficient to support application of aggravating circumstance Tenn. Code Ann. § 39-2-203(i)(6), that the murder was perpetrated to avoid prosecution;

V. Whether prosecutorial misconduct during closing argument affected the verdict to the prejudice of the appellant;

---

[1] Specifically, the trial court found that it had erroneously instructed the jury upon the (i)(7) aggravator, that the murder was committed while the defendant was engaged in committing a larceny. See Tenn. Code Ann. § 39-2-203(i)(7).

[2] The supreme court's review was limited to the application of the felony murder aggravating circumstance. The appellant did not cross-appeal his conviction for first degree murder.

[3] Prior to the re-sentencing hearing, the State filed an interlocutory appeal with this court to determine whether the State was permitted to assert a new aggravating circumstance, Tenn. Code Ann. § 39-2-203(i)(6) upon remand. Under the authority of State v. Harris, 919 S.W.2d 323 (Tenn. 1996), this court permitted the State to introduce proof of any aggravating circumstance which is otherwise legally valid. See State v. John David Terry, No. 01C01-9201-CR-00304 (Tenn. Crim. App. at Nashville, June 28, 1995), as modified, (Tenn. Crim. App. at Nashville, July 26, 1996).

VI. Whether Tennessee's death penalty statutes, Tenn. Code Ann. § 39-2-203 and § 39-2-205 are constitutional; and

VII. Whether the jury imposed an arbitrary and disproportionate sentence.

After review, we find no error of law requiring reversal. Accordingly, we affirm the jury's imposition of the sentence of death in this case.

## Factual Background [DELETED]

## Proof at the August 1997 Re-sentencing Hearing [DELETED]

## I. Imposition of Aggravator (i)(5) [DELETED]

## II. Imposition of Aggravator (i)(6) [DELETED]

## III. Prosecutorial Misconduct [DELETED]

## IV. Constitutional Challenges to Death Penalty

The appellant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. The appellant concedes that these issues have been previously rejected by the Tennessee Supreme Court, however, he raises these challenges to preserve them for future appellate review. Specifically, included within his challenge that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and Article I, Sections 8, 9, 16, and 17, and Article II, Section 2 of the Tennessee Constitution are the following:

1. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, specifically, the statutory aggravating circumstances set forth in Tenn. Code Ann. § 39-2-203(i)(2), (i)(5), (i)(6), and (i)(7) have been so broadly interpreted whether viewed singly or collectively, fail to provide such a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death.[14] This argument has been rejected by our supreme court. See State v. Vann, 976 S.W.2d 93, 117-118 (Tenn. 1998) (Appendix), cert. denied, – U.S. –, 119 S.Ct. 1467 (1999); State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994).

2. The death sentence is imposed capriciously and arbitrarily in that

---

[14] We note that factors (i)(2) and (i)(7) do not pertain to this case as they were not relied upon by the State. Thus, any individual claim with respect to these factors is without merit. See, e.g., Hall, 958 S.W.2d at 715; Brimmer, 876 S.W.2d at 87.

(a)  Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty.  This argument has been rejected.  See  Hines, 919 S.W.2d 573, 582 (Tenn. 1995), cert. denied, 519 U.S. 847, 117 S.Ct. 133 (1996).

(b)  The death penalty is imposed in a discriminatory manner based upon economics, race, geography, and gender.   This argument has been rejected.  See  Hines, 919 S.W.2d at 582; State v. Brimmer, 876 S.W.2d 75, 87 (Tenn.), cert. denied, 513 U.S. 1020, 115 S.Ct. 585 (1994); Cazes, 875 S.W.2d at 268; State v. Smith, 857 S.W.2d 1, 23 (Tenn.), cert. denied, 510 U.S. 996, 114 S.Ct. 561 (1993).

(c)  There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter. This argument has been rejected.  See State v. Caughron, 855 S.W.2d 526, 542 (Tenn.), cert. denied, 510 U.S. 979, 114 S.Ct. 475 (1993).

(d)  The death qualification process skews the make-up of the jury and results in a relatively prosecution prone guilty-prone jury. This argument has been rejected.  See  State v. Teel, 793 S.W.2d 236, 246 (Tenn.), cert. denied, 498 U.S. 1007, 111 S.Ct. 571 (1990); State v. Harbison, 704 S.W.2d  314, 318 (Tenn.), cert. denied, 470 U.S. 1153, 106 S.Ct. 2261 (1986).

(e)   Defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, *i.e.*, the cost of incarceration versus cost of execution, deterrence, method of execution. This argument has been rejected.  See  Brimmer, 876 S.W.2d at 86-87; Cazes, 875 S.W.2d at 268; Black, 815 S.W.2d at 179.

(f)  The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non-unanimous verdict. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 22-23.

(g)  Requiring the jury to agree unanimously to a life verdict violates Mills v. Maryland and McKoy v. North Carolina.  This argument has been rejected.  See  Brimmer, 876 S.W.2d at 87; Thompson, 768 S.W.2d at 250; State v. King, 718 S.W.2d 241, 249 (Tenn. 1986), superseded by statute as recognized by, State v. Hutchinson, 898 S.W.2d 161 (Tenn. 1994).

(h) The jury is not required to make the ultimate determination that death is the appropriate penalty. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Smith, 857 S.W.2d at 22.

(i) The defendant is denied final closing argument in the penalty phase of the trial. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 24; Caughron, 855 S.W.2d at 542.

3. Death by electrocution constitutes cruel and unusual punishment. This argument has been rejected. See Black, 815 S.W.2d at 179; see also Hines, 919 S.W.2d at 582.[15]

4. The reasonable doubt instruction violates due process. This argument has been routinely rejected. See Vann, 976 S.W.2d at 116 (Appendix); Nichols, 877 S.W.2d at 734; Bush, 942 S.W.2d at 504-05.

5. The appellate review process in death penalty cases is constitutionally inadequate in that (1) the reviewing court cannot properly evaluate the proof due to the absence of written findings concerning mitigating circumstances; (2) the information relied upon for comparative review is inadequate and incomplete; (3) the methodology is flawed because the pool of cases is unduly narrow, the determination is entirely subjective, and the review fails to properly function as a safeguard. This argument has been rejected by our supreme court on numerous occasions. See Cazes, 875 S.W.2d at 270-71; State v. Harris, 839 S.W.2d 54, 77 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368 (1993); Barber, 753 S.W.2d at 664. Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." See State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997), cert. denied, 523 U.S. 1083, 118 S.Ct. 1536 (1998).

Based upon the above case decisions, the appellant's constitutional challenges to Tennessee's death penalty statutes are rejected.

## V. Proportionality Review [DELETED]

## Conclusion

---

[15] The United States Supreme Court, acknowledging recent amendments to Section 922.10 of the Florida statutes permitting election between death by electrocution or death by lethal injection, dismissed as moot a grant of certiorari in a capital habeas corpus action to determine whether there is evidence to show that a particular method of execution, i.e., electrocution, violates the Eighth Amendment protection against cruel and unusual punishment. Bryan v. Moore, No. 99-6723 (U.S. Jan. 24, 2000). This ruling implies that the issue now before this court is likewise moot. See Tenn. Code Ann. § 40-23-114(c) (1998 Supp.) (election by capital defendant of death by electrocution or death by lethal injection).

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A)(C). A comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Likewise, we have considered the appellant's sentencing issues raised on appeal and have determined that none have merit. Accordingly, the appellant's sentence of death by electrocution is affirmed.[16]

_____
DAVID G. HAYES, Judge


CONCUR:


_____
DAVID H. WELLES, Judge


_____
NORMA MCGEE OGLE, Judge

---

[16] No execution date is set. Tenn. Code Ann. § 39-13-206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty. If the death sentence is upheld by the higher court on review, the supreme court will set the execution date.