IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 2006 Session

# STATE OF TENNESSEE v.  MICHAEL DALE RIMMER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-01033-34 W. Fred Axley, Judge**

---

**No. W2004-02240-CCA-R3-DD  -  Filed December 15, 2006**

---

Capital Appellant Michael Dale Rimmer appeals as of right his sentence of death resulting from the 1997 murder of Ricci Ellsworth.  In November 1998, Appellant Rimmer was convicted of theft of property, aggravated robbery and premeditated first degree murder.  He was sentenced to death for the murder conviction.  On direct appeal, a panel of this Court affirmed Appellant Rimmer's convictions but, concluding that the sentencing verdict was "enigmatic and uncertain," vacated the sentence of death and remanded for a new sentencing hearing. *See  State v. Michael D. Rimmer,* No. W1999-00637-CCA-R3-DD, 2001 WL 567960, at *1 (Tenn. Crim. App., at Jackson, May 25, 2001).  Accordingly, the case was remanded to the Criminal Court for Shelby County for re-sentencing. At the conclusion of the re-sentencing hearing in January 2004, the jury found the presence of one statutory aggravating circumstance, *i.e.*, that the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person, T.C.A. § 39-13-204(i)(2) (1997). The jury further determined that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death. The trial court approved the sentencing verdict. Appellant Rimmer timely appeals presenting for our review the following issues: (1) whether the trial court erred in denying the motion for recusal; (2) whether the trial court erred in denying the motion for a continuance; (3) whether the trial court erred in excluding mitigation evidence; (4) whether the prosecutor engaged in misconduct; (5) whether the jury instruction on reasonable doubt was error; (6) whether the Appellant knowingly and voluntarily waived his right to testify; (7) whether it was error for the jury to be informed that the Appellant had been on "death row;" (8)  whether the jury verdict was complete; (9) whether cumulative error requires reversal; and (10) whether the Tennessee death penalty statutes are constitutional.  After review, we find no error of law requiring reversal. Accordingly, we affirm the jury's imposition of the sentence of death in this case.

**Tenn. R. App. P. 3 Appeal as of Right;  Judgment of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which, JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

Brock Mehler, Nashville, Tennessee, and Joseph Ozment, Memphis, Tennessee, for the Appellant, Michael D. Rimmer.

Paul G. Summers, Attorney General and Reporter; Mark Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General, and Thomas D. Henderson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Proof at the Re-Sentencing Trial

In 1975, Donald Eugene Ellsworth married Ricci Ellsworth. Two children were born of this marriage. The couple divorced in 1977, then resumed an "off and on" relationship which persisted until 1984. Their separation was attributed to his drug problem and her drinking problem. During their separation, Ricci Ellsworth lived for a time with the Appellant, Michael Dale Rimmer. In 1994, Ricci and Donald Ellsworth remarried.

In February 1997, forty-four-year-old Ricci Ellsworth was employed as an auditor at the Memphis Inn located on Macon Cove. She worked the night shift, 11:00 p.m. to 7:00 a.m. Her husband, Donald Ellsworth, who was in the construction business, worked during the day. It was customary for Ricci Ellsworth to be going to work when Donald Ellsworth was returning home. This was the case on February 7th. Ricci Ellsworth kissed her husband goodnight and drove to work in her 1989 white Dodge Dynasty.

On February 7, 1997, a railroad crew with CSX Transportation stayed at the Memphis Inn. On February 8th, the crew management service attempted to contact the clerk at the Memphis Inn to notify the crew that a train was ready. No one answered at the motel. In response, Raymond Summers, an employee of CSX Transportation, went to the motel.

Upon his arrival at the Memphis Inn, Mr. Summers observed that the door going into the office was open but that no person was visible. He heard water running and followed the sound to the bathroom. He started to turn the water off and realized that there was blood on the sink, on the wall, on the toilet bowl and on towels. Mr. Summers left the building and reported his finding to Shelby County deputies who had just finished eating breakfast at a nearby restaurant. The officers returned to the Memphis Inn with Mr. Summers and secured the scene.

Linda Spencer, the general manager of the Memphis Inn, lived on the motel premises. She was awakened by the deputies who informed her that she needed to go to the front office. Arriving at the office, she noticed that the door was open, a cup of coffee was sitting on the desk, and everything was in order. However, as she walked back towards her office, she noticed that the area "looked like somebody had been in a fight." She then went into the bathroom. "There was blood everywhere. On the walls, on the floor . . . puddles of blood. We're not talking just spots, there were puddles of blood." She noticed that the sink was cracked. Ms. Spencer reported that $600.00 in cash was missing from the office. She added that some "towels, bath mats and [three sets of]

-2-

sheets" were missing from the storage room. Ms. Spencer observed that Ricci Ellsworth's car, a white Dodge Dynasty, was still at the hotel; however, Ricci Ellsworth was not found on the premises.

Ms. Spencer explained that Ricci Ellsworth's job duties as night auditor also required her to register guests while on duty. Ms. Spencer explained that Ricci Ellsworth should have been behind a locked, secured door while she was working.

At 2:30 a.m., Donald Ellsworth was awakened by police officers looking for Ricci Ellsworth. The police officers took Donald Ellsworth to the Memphis Inn and informed him that "it was an on-going crime scene." At this point, Mr. Ellsworth learned that "there had been a robbery and that there was blood at the scene . . . and that they hadn't been able to locate [Ricci Ellsworth.]" Mr. Ellsworth informed the officers that, "if this wasn't a random robbery . . . they needed to be looking for Michael Dale Rimmer."

Memphis Police Officer Robert G. Moore was called to the scene at the Memphis Inn. He observed that some of the blood on the bathroom floor "looked like people tried to wipe the blood up." Officer Moore added that there appeared to be "drag marks coming out of the bath room out into the office area." Officer Moore also located a green cigarette lighter beneath a bloody towel. Officer Moore identified a "gold colored ring with the black setting" as being found in the area between the bathroom and the office. A cigarette butt was found going out of the equipment room into the office area.

Sergeant Robert Shemwell, assigned to the homicide department, was called to the Memphis Inn. He later placed the names of Ricci Ellsworth and the suspect, Appellant Rimmer, in the National Crime Information Center.

Sergeant Shemwell also received information that a vehicle was observed that night backed up to the night entrance of the Memphis Inn with the door slightly opened. The vehicle was described as a Toyota or other small model car.

On the morning of March 5, 1997, Michael Dewey Adams, a Johnson County, Indiana, Sheriff's Deputy, was on traffic patrol. During his shift, Deputy Adams stopped the driver of a 1988 maroon Honda Accord with light color interior, traveling 72 miles per hour in a 55 mile per hour zone. Two people were in the vehicle. Deputy Adams observed the driver of the vehicle exit the vehicle and began walking towards him. Deputy Adams, using his vehicle's P.A. unit, advised the driver to return to the vehicle. The driver returned to his vehicle and placed both hands on the trunk of the car. The driver produced a Mississippi driver's license, which identified him as the Appellant, Michael Dale Rimmer.

Deputy Adams advised Appellant Rimmer to return to the safety of his vehicle, while he returned to his patrol car and ran a check on the Appellant's driver's license and vehicle tag number.

The check of the license plate revealed that the Honda Accord was stolen.[1]  A check of the Appellant revealed that he was wanted for questioning in a homicide in Memphis, Tennessee.  The information that Deputy Adams had stopped Appellant Rimmer was relayed to Memphis law enforcement and another officer was sent to the scene to assist Deputy Adams.  After a test revealed that the Appellant had a blood alcohol content of .06, the officer placed the Appellant under arrest for possession of a stolen vehicle and public intoxication.

A search of the Honda Accord revealed numerous hotel receipts and pawn tickets reflecting the route traveled by the Appellant after the February 7, homicide.  Specifically, the following receipts were found.  A receipt dated February 8, 1997, from Myrtle, Mississippi.  A receipt dated February 13, 1997, from Micanopy, Florida.  A receipt from Greenvalley, Missouri, dated February 15, 1997.  A receipt from Casper, Wyoming, dated February 17, 1997.  Receipts dated February 17 and 18, 1997, from Missoula, Montana.  The Appellant then traveled to Vacaville, California, as evidenced by a receipt dated February 25, 1997.  A receipt from San Francisco, California, was dated February 26, 1997.  The Appellant then traveled along the Mexican border to Blythe, California, on February 28, 1997.  He then headed east, stopping in Casa Grande, Arizona, on March 1, 1997, and Bernado, Texas, on March 3, 1997.   On March 5, 1997, he was stopped in Franklin, Indiana.

Memphis Police Sergeants Ashton, Shemwell, and Wilkinson traveled to Franklin, Indiana, to interview Appellant Rimmer.  Sergeant Ashton testified that the Appellant agreed to talk with them.  He added that the Appellant appeared relieved when he was informed that the officers wanted to talk to him about the stolen Honda Accord.  The officers noticed a change in the Appellant's demeanor, however, when they advised him that they also wanted to discuss Ricci Ellsworth.  Sergeant Ashton related that "you could see this anxiety come over him . . . he got real excited and agitated."

The officers informed Appellant Rimmer that Ricci Ellsworth was missing.  Appellant Rimmer responded "[o]h that can be cleared up, she's probably gone home to her mother in Alabama, she does it all the time."  The officers then informed Appellant that it appeared that Ricci Ellsworth was dead.  To this, the Appellant responded, "[s]he's not dead, you don't have the body."  Appellant Rimmer denied any knowledge of anything about the homicide.  He added that it was "his nature just to get up and leave [Memphis] like that."

The officers interviewed Rimmer the following day and observed that Rimmer was again "very agitated and hostile towards [the officers]. . . ."  Sergeant Ashton explained that Appellant Rimmer would "just have an out-burst and start cussing us and screaming and hollering. . . ."  During the interview, the Appellant informed the officers that his sister was being committed to Lakeside Hospital as a result of the investigation.  Appellant Rimmer also "took issue" with the investigators talking to his brother, Richard.

---

[1]The Honda was reported stolen from a residence in Memphis in early January 1997.

Sergeant Ashton explained that Appellant Rimmer had been released from prison only a few months prior to his hasty departure from Memphis. He further testified that the Appellant's employer informed him that Appellant Rimmer left in such a hurry that he left all of his tools. The Appellant had only been employed at his present job for a short time, and he left without picking up his paycheck. Sergeant Ashton added that Appellant Rimmer had also left his clothing and "stuff" in a neat folded pile beside the bed in the room he occupied at his sister's house.

Appellant Rimmer was returned from Indiana back to Shelby County, Tennessee, in an extradition van. En route to Tennessee, Appellant Rimmer "stole the van and kidnapped three other inmates and took the troopers and county deputies there on . . . a four hour run, before he was apprehended." Prior to this attempt, Appellant Rimmer had attempted to escape from the Johnson County, Indiana jail. Inside his cell in Johnson County, two "shanks" were discovered by Sergeant Shemwell. Moreover, during his original trial in Shelby County, the Appellant had a Bible in his possession which contained the outline of a handcuff key. The Appellant also attempted to escape from the Shelby County Jail by knocking out several windows.

Frank Samuel Baetchel, a forensic examiner employed by the Federal Bureau of Investigation, received a sealed envelope containing "a cutting from a towel that came from the hotel, . . .[a] carpet sample from the [Appellant's] vehicle. . ., fabric from the back seat of the vehicle, [and] some swabs from the seat belt in the back seat of the car." Mr. Baetchel performed DNA profiling on the samples according to F.B.I. protocol. He determined that "the DNA types at the various locations were the same in all of those samples, consistent with each of those having come from the same individual." Mr. Baetchel also received a sample of blood from the victim's mother, Mrs. Floyd, and a pap smear previously obtained from the victim. The DNA profiles of the samples taken from the Appellant's vehicle were consistent with being a biological offspring of Mrs. Floyd. The DNA profile taken from the pap smear was the same type as in the blood stains in the Appellant's automobile and was consistent with the DNA cutting from the towel.

Jennifer Eakin, a special agent with the Federal Bureau of Investigation, assisted the Memphis Police Department with processing and organizing the evidence. Agent Eakin collected the evidence gathered by the Memphis Police Department, *i.e.*, personal belongings of the victim; evidence gathered by the Tennessee Bureau of Investigation, *i.e.,* evidence from the defendant's vehicle and evidence collected at the crime scene; and the victim's pap smear obtained from a laboratory in Southhaven, Mississippi. She then packaged the collected items and forwarded the evidence to the F.B.I. laboratory in Washington, D.C.

In 1989, Appellant Rimmer was convicted of first degree burglary, aggravated assault and rape of Ricci Ellsworth. In 1990, Donald Ellsworth and Ricci Ellsworth resumed their relationship, and they remarried in 1994, having both overcome their individual problems. While incarcerated for the crimes committed against Ricci Ellsworth, Appellant Rimmer discussed Ricci Ellsworth with two fellow inmates, Roger LeScure and William Conaley. LeScure and Appellant Rimmer worked together in the maintenance department of the prison. Appellant Rimmer informed LeScure that Ricci Ellsworth had stopped sending him money. Appellant Rimmer also indicated that "when he

got out he was going to kill the . . . '[f]ucking bitch.'" LeScure "understood that she was the reason [Appellant Rimmer] was in there for, anyway, at the time." The Appellant also "talked quite a bit of ways to get rid of bodies. . . ." William Conaley knew Rhonda Pannell, a relative of Ricci Ellsworth. Appellant Rimmer had commented on some photographs of Conaley's which pictured Rhonda Parnell. The two men realized that they had mutual acquaintances. Appellant Rimmer informed Conaley about a lawsuit involving Ricci Ellsworth's son and how the two of them were going to be coming into some money. Appellant Rimmer planned on getting some of the money. He informed Conaley that "if he didn't get that money he would kill her." On one occasion when Conaley was granted a furlough, Appellant Rimmer asked that a message be relayed to Ricci Ellsworth about the money he was due and the death threat. The thirty-year-old Appellant was released from Department of Correction custody in October 1996.

Information was available through prison records that Ricci Ellsworth had visited Appellant Rimmer at the Northwest Correctional Center during the first several years of his sentence. However, Sergeant Shemwell related that Ricci Ellsworth stopped visiting the Appellant when she remarried Donald Ellsworth.

Ross Herrin, an employee of the Shelby County Criminal Court Clerk's Office, testified that, on June 10, 1985, Appellant Rimmer was convicted under indictment number 85-00448 of assault with intent to commit robbery with a deadly weapon. Mr. Herrin further related that, under indictment 85-00449, Appellant Rimmer entered a guilty plea to aggravated assault. For these two offenses, Appellant Rimmer received concurrent sentences of five years confinement. Mr. Herrin further related that, on June 6, 1989, Appellant Rimmer entered guilty pleas to one count of aggravated assault, one count of first degree burglary and one count of rape under indictments, 89-02746, 89-02737 and 89-02738. The indictments in these offenses related that Ricci Ellsworth was the victim. Appellant Rimmer received an effective sentence of ten years for these crimes.

T. J. Helldorfer, a Memphis Police Officer, testified that in the course of investigating the disappearance of Ricci Ellsworth, he contacted the Appellant's brother, Richard Rimmer. During a conversation, Richard Rimmer admitted that the Appellant had been to his house at approximately 9:00 a.m. on February 8, 1997. Furthermore, Richard Rimmer acknowledged that the Appellant had been to his house in the Honda Accord and that there was a shovel in the back seat. Appellant Rimmer placed the shovel against the house and then inquired as to how to get blood out of the back seat of a car. Appellant Rimmer went inside the house and cleaned up because he had "mud and stuff" on his shoes." Appellant Rimmer then left. At some point after the disappearance of Ricci Ellsworth was broadcast on television, Richard Rimmer and a friend got rid of the shovel by placing it in a dumpster at an apartment complex. Officer Helldorfer searched Richard Rimmer's property located in Nesbitt, Mississippi, fifteen miles from Memphis. A search of this property with cadaver dogs and a helicopter with the Flora system (an infra-red heat detection system) failed to reveal the body of Ricci Ellsworth.

Darlene Sills, the Appellant's girlfriend until the night prior to the murder, informed officers that Appellant Rimmer had taken her to Plantation Point on Arkabutla Lake. She stated that this

"was a place that [the Appellant] liked to go to get right with the world and smoke his dope." Officer Helldorfer stated that they searched this area on Arkabutla Lake, but this search also failed to reveal the victim's body.

Samera Zavaro, a forensic scientist in the serology DNA department of the Tennessee Bureau of Investigation, examined the maroon Honda Accord automobile. Ms. Zavaro determined that the blood stains found in the Appellant's Honda Accord were human blood.

Donald Ellsworth described Ricci Ellsworth as a "very good person." She had changed her ways. She had found a church that she had attended for seven or eight years. She was involved in prison ministry and was a good, kind and caring person. Mr. Ellsworth explained that he lost his wife and their children had lost their mother. He stated that Ricci's murder was especially hard on their daughter Tracy, who was fourteen at the time.

Recalling his wife's relationship with Appellant Rimmer, Mr. Ellsworth stated that he was not happy with the relationship and he was "worried about it." He explained that "there had been fights and there had been trouble and the police had been involved and Ricci had been hurt in the past by Michael." Mr. Ellsworth acknowledged that during this time Ricci was drinking.

On cross-examination, Mr. Ellsworth admitted that he had found some photographs of Appellant Rimmer located in a box in his home. He maintained that the photographs did not make him jealous as the photographs were taken before he and Ricci had gotten back together. Mr. Ellsworth additionally stated that Ricci had visited Appellant Rimmer while he was in prison in the early 1990's. Mr. Ellsworth admitted that he was familiar with his wife's work area, but maintained that he seldom visited her at her place of employment.

While Mr. Ellsworth stated that the last time he saw Appellant Rimmer was before he had gotten back together with his wife, he could not state the last time that Ricci had seen the Appellant. He also stated that, during the time that Ricci was living with Appellant Rimmer, Mr. Ellsworth was given "emergency, temporary custody of the children." Mr. Ellsworth denied any allegation that he was involved in the murder of Ricci Ellsworth.

The victim's mother, Marjorie Floyd, a resident of Florence, Alabama, testified that Ricci was one of four sisters. Mrs. Floyd last saw Ricci on January 28, 1997 at an anniversary dinner held in Corinth, Mississippi. Mrs. Floyd recalled having long telephone conversations with Ricci on a regular basis.

Mrs. Floyd stated that Ricci will never be replaced and that she will never stop grieving for her. She explained that there could be no closure because Ricci's body was never found and the family could not bury her. Mrs. Floyd stated that her daughter had become a Christian and was active in the prison ministry. She described her daughter as a trusting person. She added that the murder had a significant impact on Ricci's children.

On cross-examination, Mrs. Floyd stated that she could not particularly recall Appellant Rimmer. She also stated that her daughter had been married to three different men, Donald Ellsworth, Paul Vickey and Tommy West. Mrs. Floyd also related that she was aware that Ricci had visited Appellant Rimmer when he was in prison.

Linda Spencer, the general manager of the Memphis Inn, described Ricci as being an "excellent" employee, "[h]onest," and "[d]ependable."

William Conaley stated that he testified against Appellant Rimmer at his original trial. Both Conaley and Appellant Rimmer were being held in the Shelby County Jail. While Conaley was in the shower area, Appellant Rimmer attacked him.

In mitigation, the Appellant presented the testimony of Dr. Ann Marie Charvat, a mitigation specialist. Dr. Charvat testified that she interviewed Appellant Rimmer, during which she was able to obtain a chronology of his life. She also interviewed the Appellant's mother and father. As a result of her investigation, Dr. Charvat made numerous findings and provided the following synopsis:

> Mr. and Mrs. Rimmer, they met each other when she was fifteen and he was eighteen. And her father opened restaurants and had gone to Milan, Tennessee and opened up a restaurant where she met Mr. Rimmer. And her father tried to keep them apart and moved her back to Memphis, but he followed. And the[y] married. She was quite young and she had three children, in quick succession. [Appellant] Rimmer was the middle child. He has an older sister and a younger brother.

> And he worked in the field of paint and body. . . . He fixed the outside of cars. And early on, though, he traveled with his family from Memphis to Houston for work. And while they were there, there was difficulty.

> He ended up being arrested. It was relatively minor.

>      . . . .

> It resulted in probation, which he successfully completed. And then the family moved to Indianapolis. That's where Mrs. Rimmer's mother was. And they ended up getting a divorce there.

> In fact, I think that they were there two to three years. Michael and his sister started school in Indianapolis. And then the family reconnected, they remarried and they all move back to Horn Lake, actually the first place that they lived is the Southaven area, next door to it. They moved back to Mississippi and Mr. Rimmer got a job working with the City of Memphis and kept that job for twenty-six years.

Mrs. Rimmer was a home-maker, up until, I believe Michael Rimmer was probably about eleven years old. She stayed home with her children prior to that.

Dr. Charvat testified that the Appellant began having difficulties in school around the fifth grade. This is the same time that Mrs. Rimmer went back to work. Most of the problems were behavioral; he became difficult to manage in the classroom and excluded himself from class activities. Dr. Charvat described the Appellant as a "C" student; however, she opined that he would have benefitted from special education classes. The Appellant dropped out of school in the ninth grade. Prior to this, however, the Appellant was hospitalized during a time when his father was being treated for a mental illness. The Appellant was hospitalized at least three times as an adolescent. One of these hospitalizations was the direct result of the Appellant's involvement with an older woman, possibly a teacher. Once he left school, the Appellant began working at a gas station and worked at his father's shop.

At age eighteen, the Appellant was arrested for aggravated assault. This arrest arose when he and his friends attempted to purchase some marijuana and became involved in a fight. The Appellant was the only one involved in the incident to be sent to prison. The others were given time in the county jail or received probation. The Appellant reported that, while he was in prison, he met an older man, Jimmy Watson. Watson introduced the Appellant to Ricci Ellsworth. Apparently, Ricci Ellsworth was seeing Jimmy Watson at the time, but decided that she would prefer a relationship with the Appellant. The Appellant and his family members reported that the Appellant's time with Ricci Ellsworth was the happiest time in his life. The Appellant lived with Ricci and her children.

While Dr. Charvat stated that the Appellant had entered a guilty plea to raping Ricci Ellsworth, she understood that the relationship between the two continued even after this incident. The relationship resumed even while the Appellant was serving his sentence for the crime. Ricci Ellsworth visited the Appellant while he was in prison and was even identified on the approved visitor list as the Appellant's common law wife. Christopher and Tracy Ellsworth, Ricci Ellsworth's children, were also named on the list.

Barbara Dycus ministered to the Appellant at West Tennessee State Penitentiary. Ms. Dycus also knew Ricci Ellsworth through her relationship at Bolton Full Gospel Church. Ricci Ellsworth had informed Ms. Dycus that she was engaged to Appellant Rimmer while he was confined at West Tennessee State Penitentiary in 1993. Ms. Dycus further related that the Appellant attended every service that she administered on Saturday evenings. Appellant Rimmer played music, wrote gospel songs and sang during the services.

Thomas Mach visited the Appellant while he was on death row at Riverbend Maximum Security Institution through his involvement in the prison ministry. Mach stated that the Appellant has done amazing things once he was removed from death row. The Appellant got eighteen other men interested in the Bible. Mach stated that he believed that the Appellant had changed.

Nathaniel Hatcher met the Appellant while he was serving as the prison minister in 1998. Hatcher described the Appellant as "a fantastic guy." He added that the Appellant had a good positive attitude and he and the Appellant became friends. Hatcher also described how the Appellant had impacted the other men in his unit. Hatcher maintained his assertion that he admired the Appellant even considering the Appellant's convictions for aggravated assault, rape, burglary and murder.

The Appellant's mother, Sandra Rimmer, stated that the Appellant was thirty-seven years old at the time of the re-sentencing hearing. Mrs. Rimmer explained that the Appellant and Ricci Ellsworth began a romantic relationship in 1986 or 1987. The Appellant then began living with Ricci Ellsworth and her children. Mrs. Rimmer explained that, at one point, the Appellant moved out of Ricci's home and Jimmy Watson, Ricci's former boyfriend, moved back in with Ricci. Then, after a while, Jimmy would move out and the Appellant would move back in with Ricci. Sandra Rimmer related that, during this time, both the Appellant and Ricci were drinking, smoking marijuana and "I don't know what else."

Sandra Rimmer reported that in 1989 or 1990, the Appellant was arrested for assaulting and raping Ricci Ellsworth. Mrs. Rimmer explained that, when the Appellant was in jail for these offenses, Ricci Ellsworth married Tommy Voyles.[2] She also stated that, although accused of breaking into Ricci Ellsworth's home, the Appellant had a key to the house and his belongings were inside.

Mrs. Rimmer also stated that she took Ricci Ellsworth to visit the Appellant in prison. During the drive to the prison, Ricci Ellsworth confided to Sandra Rimmer that the Appellant really did not rape her. Ricci Ellsworth explained that she, Tommy Voyles and the Appellant had gotten into a fight. Mrs. Rimmer related that Ricci Ellsworth stated that Tommy Voyles had "pushed her" into filing the charges against the Appellant. Mrs. Rimmer further described the relationship between the Appellant and Ricci Ellsworth as boyfriend and girlfriend, even after he was convicted of raping her. Mrs. Rimmer testified that the Appellant was released from prison in October 1996.

The trial court instructed the jury regarding the statutory aggravating and mitigating factors:

Tennessee law provides that no sentence of death or sentence of imprisonment for life without the possibility of parole shall be imposed by a jury, but upon unanimous finding that the state has proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances which shall be limited to the following:

(1) The defendant was previously convicted of one, or more felonies other than the present charge. The statutory elements of which involve the use of violence to the person.

---

[2]The record suggests that Tommy West and Tommy Voyles are the same person.

The state is relying upon crimes of assault to rob . . . aggravated assault . . ., aggravated assault . . ., and rape . . ., which is, or are, a felony involving the use of violence to the person.

> (2) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing, or attempting to commit any robbery.

Members of the jury, the Court has read to you the aggravated circumstances which the law requires you to consider if you find proof beyond a reasonable doubt.

You shall not consider any other facts or circumstances as an aggravated circumstance in deciding whether the death penalty, or imprisonment for life without possibility of parole, would be appropriate punishment in this case.

Mitigating circumstances. Tennessee law provides that in arriving at the punishment the jury shall consider as previously indicated, any mitigating circumstances raised by the evidence, which shall include, but are not limited to the following:

> (1) Any attempts by the defendant to participate in efforts at rehabilitation while incarcerated.
> (2) Any evidence which tends to cast doubt on the defendant's guilt.
> (3) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt, or sentencing hearing. That is, you shall consider any aspect of the defendant's character, or record or any aspect of he circumstances of the offense favorable to the defendant, which is supported by the evidence.

The trial court further instructed the jury that should they find that at least one statutory aggravating circumstance had been proven beyond a reasonable doubt and that circumstance had been proven by the State to outweigh any mitigating circumstances beyond a reasonable doubt the sentence shall be death. The trial court provided instructions as to how the jury was to reduce their verdict to writing.

The jury retired to deliberate at 1:10 p.m. Deliberations adjourned at 6:05 p.m. that evening, and resumed the next day at 8:48 a.m. At 11:40 a.m, the jury returned with its verdict, finding that the State had proven beyond a reasonable doubt the presence of the (i)(2) aggravating circumstance. The jury further determined that this factor outweighed any mitigating circumstances and, accordingly, imposed a sentence of death.

## I. Recusal of Trial Court

-11-

Appellant Rimmer contends that the trial judge "exhibited actual bias against the defendant." Additionally, he asserts that "the judge's impartiality might reasonably be questioned." In support of these claims, Rimmer contends that the "re-sentencing hearing was necessitated by a combination of errors committed by [the trial judge] in the first trial." He further alleges that, during a hearing on the motion to recuse, the trial judge denied revising the jury verdict as found by the appellate court, stating that "[t]hey said that the second stage proceeding jury instructions were confusing to the jury." Appellant Rimmer raised numerous other factors in support of the trial judge's bias including: (1) the trial judge's refusal to reappoint the lawyers who had secured the reversal from the Court of Criminal Appeals, (2) the trial judge adopted extraordinary security measures, (3) the trial judge failed to conduct hearings at Riverbend Maximum Security Institution as required by section 16-1-105, Tennessee Code Annotated, (4) the trial judge made misstatements of fact in the Rule 12 report, (5) the trial judge exhibited an adversarial position toward the Appellant after the guilt phase of the trial, (6) the trial judge excluded proffered evidence in mitigation, and (7) the trial judge's numerous decisions which effectively denied the Appellant time to properly prepare the case.

A fair trial in a fair tribunal is a basic requirement of due process. The "principles of impartiality, disinterestedness and fairness" are fundamental concepts in our jurisprudence. *See State v. Bondurant*, 4 S.W.3d 662, 668 (Tenn. 1999) (quoting *State v. Lynn*, 924 S.W.2d 892, 898 (Tenn. 1996)). Article I, Section 17 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution guarantee all litigants a hearing before an impartial decision-maker. *In re Cameron*, 126 Tenn. 614, 658, 151 S.W.64, 76 (1912); *see also Tumey v. Ohio*, 273 U.S. 510, 532, 47 S. Ct. 437 (1927) ("every procedure which would offer a possible temptation to the average man as a judge [to forget the burden of proof required to convict the defendant, or which might lead him] not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law"). Article VI, Section 11 of the Tennessee Constitution states that judges cannot participate in cases in which they might have even the slightest interest. *Neely v. State*, 63 Tenn. 174, 182 (1874). A similar restriction appears in Tennessee Code Annotated section 17-2-101(1). The purpose of these provisions is to guard against the prejudgment of a litigant's rights and to avoid situations in which the litigants might believe that the court reached a prejudiced conclusion because of interest, partiality or favor. *Chumbley v. Peoples Bank & Trust Co.,* 165 Tenn. 655, 659, 57 S.W.2d 787, 788 (1922).

Society demands a judge who is "independent of governmental, political, social, economic, or other predisposing influences." *State v. Alley*, 882 S.W.2d 810, 819 (Tenn. Crim. App. 1994). A judge possessing these qualities can "approach the decision of any question in a case guided solely by legal knowledge and judicial experience and temperament." *Id.* (citing Charles W. Wolfram, *Modern Legal Ethics* 980 (1986)). Although this ideal is one that is difficult to achieve, it is a fundamental principle of due process that a judge presiding at trial "must be sufficiently neutral and free of preconceptions about the factual issues to be able to render a fair decision." *Alley*, 882 S.W.2d at 820 (citation omitted). A trial before a biased or prejudiced judge is a denial of due process. *Wilson v. Wilson*, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998). Many years ago, the Tennessee Supreme Court observed: "[I]t is of immense importance, not only that justice shall be administered . . ., but that [the public] shall have no sound reason for supposing that it is not

administered." *In re Cameron,* 126 Tenn. at 614, 151 S.W. at 76. "If the public is to maintain confidence in the judiciary, it is required that cases be tried by unprejudiced and unbiased judges." *Alley*, 882 S.W.2d at 820 (citations omitted).

The words "bias" and "prejudice" are central to the determination of whether a recusal should be granted. *See Alley*, 882 S.W.2d at 820. Generally, the terms refer to a state of mind or attitude that works to predispose a judge for or against a party. *Id.* (citing 46 Am.Jur.2d "Judges" § 167 (1969)). Not every bias, partiality, or prejudice merits recusal. *Alley*, 882 S.W.2d at 820. To disqualify, prejudice must be of a personal character, directed at the litigant, "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case." *Id.* (citations omitted). Personal bias involves an antagonism toward the moving party, but does not refer to any views that a judge may have regarding the subject matter at issue. *Id.* (citations omitted). If the bias is based upon actual observance of witnesses and evidence given during the trial, the judge's prejudice does not disqualify the judge. *Id*. (citation omitted). However, if the bias is so pervasive that it is sufficient to deny the litigant a fair trial, it need not be extrajudicial. *Id.* (citations omitted).

A trial judge should recuse himself or herself whenever the judge has any doubt as to his or her ability to preside impartially or whenever his or her impartiality can reasonably be questioned. *State v. Pannell,* 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001). This is an objective standard. *Alley,* 882 S.W.2d at 820. The appearance of impropriety is conceptually distinct from the subjective approach of a judge facing a possible disqualification challenge and does not depend on the judge's belief that he or she is acting properly. *See Liteky v. United States*, 510 U.S. 540, 553, n.2, 114 S. Ct. 1147 (1994) ("The judge does not have to be subjectively biased or prejudiced, so long as he appears to be so."). "Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Id.* The trial judge retains discretion over his or her recusal. *State v. Smith,* 906 S.W.2d 6, 11 (Tenn. Crim. App. 1995). Unless the evidence in the record indicates that the failure to recuse was an abuse of discretion, this Court will not interfere with that decision. *State v. Hines,* 919 S.W.2d 573, 578 (Tenn.1995).

Appellant Rimmer alleges that the trial court abused its discretion when it denied his recusal motion specifically because this same judge committed error in the initial trial regarding the jury verdict, made alleged misstatements in the Rule 12 report, made critical decisions denying a continuance to the defense team and excluding evidence in mitigation, and failed to conduct hearings at Riverbend Maximum Security Institution as required by Tennessee Code Annotated section 16-1-105. Adverse rulings by a trial court are not usually sufficient grounds to establish bias. *Alley*, 882 S.W.2d at 820 (citations omitted). Moreover, rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification. *Id.* (citations omitted).

Appellant Rimmer alleges that the trial court adopted extraordinary security measures. The record reveals that Appellant Rimmer made numerous escape attempts after being taken into custody

and that two weapons were removed from the Appellant's person in the courtroom prior to the original trial. Appellant Rimmer has not established that the security measures employed by the trial court were not warranted under the circumstances. Accordingly, the trial court's implementation of security measures cannot support a motion for recusal. The Appellant also contends that the trial court demonstrated bias when it refused to re-appoint counsel who were successful in obtaining relief on direct appeal. Nothing in the record demonstrates that the trial court erred in this respect nor does the Appellant establish how appointment of different counsel established bias by the trial judge or raised a question of impartiality.

The Appellant focuses the majority of his recusal argument toward accusations that the trial judge made numerous misstatements of facts, made numerous questionable statements during the first trial and refused to apply an objective standard regarding his impartiality. While comments made by a judge may be demonstrative of bias or prejudice, the Appellant has failed to direct this Court's attention to any such comments. Moreover, misstatements of fact are insufficient to support a showing of bias. Likewise, comments made by a judge in a separate and unrelated case cannot be imputed to the case now before us. However, in so far as the remarks indicate a judge's personal moral conviction or which "reflect prevailing societal attitudes," such remarks are insufficient alone to mandate disqualification. *Alley*, 882 S.W.2d at 820 (citing *United States v. Norton,* 700 F.2d 1072, 1076 (6th Cir.1983); *State v. Hawk,* 688 S.W.2d 467, 472 (Tenn. Crim. App.1985); *State v. Bobby Andrew Higdon,* No. 89-41-III, 1990 WL 26772 (Tenn. Crim. App., Nashville, Mar. 15, 1990)). There is no indication in the record before us that the trial judge prejudged any factual issues that arose related to the re-sentencing hearing.

After review of the record before this Court and the allegations raised by the Appellant, we are unable to conclude that the trial court abused its discretion in denying the motion for recusal.

## II. Denial of Continuance

On December 19, 2003, Appellant Rimmer filed a motion requesting a continuance of the re-sentencing trial scheduled for January 5, 2004. Trial counsel was appointed to represent the Appellant in February 2003, after the Appellant's initial attorneys were granted permission to withdraw. As grounds for the continuance, the Appellant asserted that counsel were not prepared to proceed due to lead counsel's position as lead counsel in another capital murder trial scheduled for January 26, 2004. The Appellant further maintained that additional time was required as (1) it was necessary to secure and review "boxes and boxes of records," (2) he was housed 200 miles from his attorneys, (3) there had been problems in obtaining funding for experts and (4) the mitigation specialist had not completed her investigation and preparation. The trial court denied the motion for a continuance. In its order denying the motion for a new sentencing trial, the trial court noted that no prejudice had resulted from the denial of the continuance. In rendering this decision, the trial court considered the mitigating evidence presented at trial.

Appellant Rimmer challenges the trial court's denial of the continuance, asserting that "[i]t is unreasonable to demand a showing of actual prejudice from the denial of a continuance to allow

time for completing a mitigation investigation; one cannot know what might have been discovered had more time been allotted; the basic task remains unfinished, and there is no way to measure what impact the unpresented mitigation might have had on a capital sentencing jury." Appellant Rimmer adds that his trial attorneys had "just a little over 10 months to do a complete investigation of not only the defendant's social, educational, vocational, medical, institutional, and psychological history, but also of the crime, his past crimes, and the litigation that he had been engaged in by 3 prior sets of attorneys." Appellant Rimmer further suggests that the "trial judge was more concerned with expediency than fairness." The State responds that the Appellant cannot show that the lower court's decision was an abuse of discretion.

The granting of a continuance rests within the sound discretion of the trial court. *See State v. Odom,* 137 S.W.3d 572, 589 (Tenn. 2004); *State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999). This Court will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *Odom*, 137 S.W.3d at 589. "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *Hines*, 919 S.W.2d at 579. The defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice. *Odom*, 137 S.W.3d at 589.

Although the Appellant avers that a continuance was necessary in order for the mitigation specialist to complete her investigation, the record reflects that Dr. Charvat never indicated that her investigation was not complete. Rather, Dr. Charvat explained that the "notebook" in possession of defense counsel had not been updated.[3] Notwithstanding, Dr. Charvat also testified that "[i]f you think about it, there is no end to how much information one could collect on an individual." She also described the "information" collected as being capable of constant change. The record reveals that Dr. Charvat provided ample testimony regarding the Appellant's background.

Nothing in the record suggests that the trial court abused its discretion, thereby prejudicing the Appellant. The matter was remanded for re-sentencing by this Court on May 25, 2001. Counsel for the re-sentencing were appointed on March 20, 2002. These attorneys were granted permission to withdraw in February 2003, at which time substitute counsel were appointed. The re-sentencing hearing began on January 5, 2004, nearly three years from the date of reversal and nearly eleven months after trial counsel's appointment. Trial counsel was privy to information in the possession of counsel originally appointed for the re-sentencing. *See, e.g.*, *State v. Jimmy D. Dillingham,* 03C01-9110-CR-319, 1993 WL 22155 at *2 (Tenn. Crim. App., at Knoxville, Feb. 13, 1993), *perm. to appeal denied,* (Tenn.1993) (holding that trial court did not abuse discretion in denying continuance where public defender was afforded one month to prepare for case where previous

---

[3] Dr. Charvat testified that the notebook in the possession of defense counsel was "prepared . . . in the initial stages [of her investigation]." In this regard, she explained that "when you create these things and when you start these studies, some of the information changes as you secure more data. So that one dated six or seven months ago, is not particularly germane to what's going on today and what we know at this point in time." These statements made by Dr. Charvat cannot be construed as an assertion that she needed additional time to complete a sufficient mitigation investigation.

attorney had been involved as public defender and had benefit of prior counsel's preparations and efforts).

Although a capital case will clearly require more preparation by defense counsel than a non-capital case, we conclude that counsel was afforded adequate time to familiarize themselves with the facts and present evidence in mitigation on the Appellant's behalf. There is no indication in the record that eleven months was insufficient time for the attorneys to prepare for the re-sentencing trial. The Appellant had the benefit of a mitigation specialist. The mitigation specialist failed to state that her investigation was complete, but noted that any investigation of this type would be constantly changing. A review of the record fails to demonstrate that Dr. Charvat's investigation was impeded by the denial of the continuance. Moreover, the record fails to demonstrate what, if any, mitigation proof would have been uncovered had Dr. Charvat been provided more time. We conclude that the trial court did not abuse its discretion nor was the Appellant prejudiced by the denial of the continuance. This issue is without merit.

### III. Exclusion of Mitigation Evidence

Appellant Rimmer contends that the trial court committed reversible error by excluding evidence offered to support the mitigating circumstance of residual doubt and by excluding evidence to rebut the (i)(2) aggravating circumstance relied on by the prosecution.

The admissibility of evidence at capital sentencing hearings is governed by section 39-13-204(c), Tennessee Code Annotated, which provides:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection (c) shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

Our supreme court has recognized that, under this statute, any evidence which is relevant to the circumstances of the murder, the aggravating circumstances of the murder, or the mitigating circumstances of the murder, and which has probative value in the determination of punishment is admissible at a capital sentencing hearing. *See State v. Austin*, 87 S.W.3d 447, 459 (Tenn. 2002) (citing *State v. Teague*, 897 S.W.2d 248, 250 (Tenn. 1995)). Additionally, "a defendant [is] allowed to present evidence at a[ ]sentencing hearing to establish residual doubt as a non-statutory mitigating

circumstance." *State v. Hartman,* 42 S.W.3d 44, 55 (Tenn. 2001) (citing *Teague,* 897 S.W.2d at 256). Residual doubt evidence is typically established by proof which casts doubt upon a defendant's guilt, which proof is not limited to evidence mitigating a defendant's culpability for the offense. *See Hartman,* 42 S.W.3d at 57. As the exclusion of mitigating evidence potentially undermines the reliability of the sentencing determination, any error in failing to admit such evidence is reviewed by this Court under a constitutional harmless error standard. *Austin*, 87 S.W.3d at 459 (citing *State v. Cauthern*, 967 S.W.2d 726, 739 (Tenn. 1998)). The burden thus falls on the State to prove that any error in excluding the evidence did not affect the verdict and was harmless beyond a reasonable doubt. *Id.* (citing *Satterwhite v. Texas,* 486 U.S. 249, 258, 108 S. Ct. 1792, 1798 (1988); *Chapman v. California,* 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967)).

### A. Residual Doubt Evidence

Appellant Rimmer asserts that the trial court excluded mitigation evidence of residual doubt by sustaining hearsay and relevance objections to testimony that two individuals were observed at the scene of the crime with blood on their hands and that a car was backed up to the night office. Specifically, the Appellant argues that the trial court erroneously prohibited the victim's husband from answering a question regarding whether law enforcement officers had informed him that they had reason to believe that more than one person was involved in the commission of the crime. The Appellant also argues that the re-sentencing jury was not informed that the jury that convicted the Appellant never considered any evidence that more than one person may have been involved in the crime. The trial court sustained objections raised by the State on numerous grounds, including that such testimony on these matters were hearsay.

The Appellant is correct in that hearsay is admissible in a capital sentencing hearing. *Austin*, 87 S.W.3d at 459; *State v. Odom*, 928 S.W.2d 18, 28 (Tenn. 1996). The State asserts that, notwithstanding the fact that several objections were made and sustained, the jury heard testimony indicating that two men were observed at the scene of the crime with blood on their hands and that a car was backed up to the night office with its trunk open at that time. Accordingly, the State asserts that no error was committed regarding residual doubt evidence.

At the re-sentencing hearing, Sergeant Robert Shemwell testified he had talked with James Darnell who had attempted to check into the Memphis Inn that morning. James Darnell reported that he and Dixie Roberts went to the Memphis Inn between 1:45 a.m. and 2:00 a.m. on February 8, 1997. Darnell observed through the check-out window a white male bleeding from his hands and another white male on the other side of the check-out window. He further described the first male as being in his early twenties, long red hair, wearing an orange ball cap and wearing blue jeans. Darnell stated that the man appeared very drunk. Darnell believed the other man to have been the clerk. He described the second male as being thirty years of age, long brown hair, moustache and wearing blue jeans. Darnell observed the man believed to be the clerk hand money through the check out window to the other male. Darnell was uncomfortable with the situation and left to go somewhere else. Photographs of suspects were sent to Darnell via the Federal Bureau of Investigation. Darnell could not positively identify either man from the photospread. A photograph

of Appellant Rimmer was included in the photospread. Sergeant Shemwell additionally testified that he had received information that a vehicle, described as a Toyota, was backed to the night entrance of the Memphis Inn.

The record reveals that the same information that the Appellant now asserts was excluded was actually presented to the jury. While the Appellant claims that the trial court improperly excluded residual doubt evidence from the jury's consideration, the record reveals that the jury did have such information. Thus, any error in excluding the introduction of the same evidence through another form was harmless beyond a reasonable doubt.

## B. Rebuttal of Aggravating Circumstance

Appellant Rimmer also contends that the trial court excluded evidence that would have rebutted the (i)(2) aggravating circumstance. Specifically, Appellant asserts that he attempted to elicit testimony from Sandra Rimmer regarding the details of his assault and rape convictions. The prosecution objected, alleging that such testimony was hearsay. The trial court sustained the objections.

Notwithstanding the Appellant's argument, the record reveals that the jury did hear testimony that the Appellant, the victim, and a man named "Tommy" got into a fight. The jury also heard testimony that the victim told Sandra Rimmer that the Appellant did not really rape her and that "Tommy" had talked her into filing the rape charges. Furthermore, the jury heard testimony that the victim continued to visit the Appellant while incarcerated on the rape charges. Moreover, Sandra Rimmer described the Appellant and the victim as "girlfriend and boyfriend." As the jury had before it information that was allegedly "excluded," we conclude any error in its exclusion is harmless.

In the present case, the jury actually heard the evidence that the Appellant now complains was improperly excluded. The evidence supported the jury's finding of the statutory aggravating circumstance. The jury also had sufficient evidence upon which to weigh the aggravating and mitigating circumstances. Accordingly, we cannot conclude that the Appellant is entitled to relief on this issue.

## IV. Prosecutorial Misconduct

Appellant Rimmer contends that, at the re-sentencing hearing, the prosecutor, Thomas D. Henderson, made "more than 20 baseless objections to hearsay evidence." The Appellant asserts that these "repeated, baseless objections to [his] evidence as 'hearsay' constituted prosecutorial misconduct, and violated [his] rights under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, and Art. I, § 8 and 16 of the Tennessee Constitution." In support of his allegation, Appellant Rimmer relies upon the fact that Mr. Henderson is an experienced prosecutor and is charged with constructive knowledge of the law that "hearsay is admissible in a capital sentencing hearing." *Austin*, 87 S.W.3d at 447. He further contends that "Thomas D. Henderson, by his own admission, was 'near apoplectic in objecting, almost every opportunity." The Appellant

concludes that the numerous objections were "a blatant effort to undermine defense counsel's ability to present his case." The State responds that the objections made by the State were to either inadmissible hearsay or matters of non-relevance. The State further asserts that some of the objections were sustained and, in many instances, defense counsel withdrew the question. The State contends that the objections do not rise to the level of prosecutorial misconduct, averring that this was a case where the "prosecutors struck hard blows as they were entitled to do."

In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury. *People v. Strickland*, 11 Cal.3d 946, 955, 114 Cal. Rptr. 632, 523 P.2d 672 (1974). But the defendant need not show that the prosecutor acted in bad faith or with appreciation for the wrongfulness of the conduct, nor is a claim of prosecutorial misconduct defeated by a showing of the prosecutor's subjective good faith. *People v. Bolton*, 23 Cal.3d 208, 214, 152 Cal.Rptr.141, 589 P.2d 396 (1979).

Our review of the record reveals approximately twenty-eight objections made by the prosecutor during the course of the re-sentencing hearing. Grounds for the objections included but were not limited to relevance and hearsay. Many of the objections resulted in defense counsel withdrawing the question. Some objections were sustained, while others were overruled. Bench conferences reveal that the prosecutor, Thomas Henderson, was well aware of the applicable law regarding admissible hearsay and provided rational argument in support of his objections. The State has a legitimate interest in the outcome of a proceeding and, as such, the State has a legitimate right in advocating its interpretation of applicable law regarding the admissibility of evidence. While some series of objections were incessant, there is no indication in the record that the objections were without legal basis or were made merely as an attempt to comment upon the credibility of the testimony. We conclude that the objections, viewed either singly or collectively, did not deny the Appellant a fair trial or result in any prejudice. This Court remains convinced that the objections complained of by the Appellant were not the source of any prejudicial error.

### V. Instruction on Reasonable Doubt

Appellant Rimmer next contends that the trial court's instruction on reasonable doubt impermissibly lowered the prosecution's burden of proof. Specifically, Rimmer contests that part of the instruction providing "[r]easonable doubt does not mean a doubt that may arise from possibility," *see* T.P.I. – Crim. §2.03 (West 2000), "suggests an improperly high degree of doubt for acquittal and lowers the prosecution's burden of proof in violation of the state and federal constitutions."

The instruction provided by the trial court is as follows:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt.

Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law.

The Appellant concedes that this instruction conforms largely to that provided in the Tennessee Pattern Jury Instructions Criminal, Fifth Edition, § 2.03.

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243 (1994). As long as the "court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.* (citations omitted). Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Holland v. United States,* 348 U.S. 121, 140, 75 S. Ct. 127, 138 (1954). Considering the full context of the trial court's instruction, we conclude that the trial court's instruction on the definition of reasonable doubt "sufficiently described the degree of doubt necessary for acquittal and the degree of proof necessary for conviction." *See Pettyjohn v. State*, 885 S.W.2d 364, 365 (Tenn. Crim. App. 1994).

Numerous case law decisions have concluded that the exact instruction as submitted to the jury in this case is not error. *State v. Hall,* 976 S.W.2d 121, 159 (Tenn. 1998), *cert. denied,* 526 U.S. 1089, 119 S. Ct. 1501 (1999); *State v. Bush,* 942 S.W.2d 489, 520-521 (Tenn.), *cert. denied,* 522 U.S. 953, 118 S. Ct. 376 (1997); *Scott v. State,* No. 01C01-9709-CR-00400, 1999 WL 233643, at **9-10 (Tenn. Crim. App. at Nashville, April 20, 1999); *State v. Cowart,* No. 03C01-9512-CR-00402, 1999 WL 5174, at *23 (Tenn. Crim. App. at Knoxville), *perm. to appeal denied,* (Tenn. 1999); *Lane v. State,* No. 02C01- 9604-CC-00133, 1998 WL 756746, *7 (Tenn. Crim. App. at Jackson, October 30, 1998), *perm. to appeal denied*, (Tenn. 1999). Tennessee courts have consistently approved jury instructions patterned after T.P.I. (Crim.) 2.03. *E.g., State v. Nichols,* 877 S.W.2d 722 (Tenn. 1994); *State v. Sexton,* 917 S.W.2d 263 (Tenn. Crim. App. 1995); *Pettyjohn,* 885 S.W.2d at 364. In fact, this Court has encouraged the use of T.P.I. (Crim.) 2.03 over the use of the alternate pattern instruction on "reasonable doubt" found in T.P.I. (Crim.) 2.03(a). *E.g., State v. Jose Holmes*, No. 02C01-9505-CR-00154 (Tenn. Crim. App. at Jackson, Dec. 10, 1997); *State v. Derek Denton,* C.C.A. No. 02C01-9409-CR-00186 (Tenn. Crim. App., at Jackson, Aug. 2, 1996). Moreover, the Sixth Circuit has confirmed the constitutionality of the exact language used in the jury instruction in the instant case. *Austin v. Bell,* 126 F.3d 843 (6th Cir.1997). We continue to adhere to the long tradition of authority that has found jury instructions like the one given here constitutionally sound. The Appellant's argument is without merit.

## VI. Waiver of Right to Testify

Next, Appellant Rimmer contends that "[n]either the colloquy with his own counsel nor with the court established that the waiver of the defendant's right to testify in the sentencing hearing was knowing, intelligent and voluntary as required by the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the U.S. Constitution, and Art. I, §§ 8, 9, and 16 of the Tennessee Constitution." Specifically, Appellant Rimmer maintains that "[t]he colloquy with the court concerned only whether the defendant chose not to testify of his own free will." He maintains that the right to testify in the capital sentencing context includes a limited privilege against self-incrimination, that is, an ability to testify about mitigating circumstances and not be cross-examined about the facts and circumstances of the murder unless he opens the door. *State v. Cazes*, 875 S.W.2d 253, 266 (Tenn. 1994). The colloquy regarding his waiver fails to indicate that Appellant Rimmer was advised of this aspect of his right to testify.

The right of a criminal defendant to testify in his or her own behalf at trial is a fundamental constitutional right. *Momon v. State*, 18 S.W.3d 152, 157 (Tenn. 1999). The right may only be waived personally by the defendant. *Id.* A right that is fundamental and personal to the defendant may only be waived if there is evidence in the record demonstrating "an intentional relinquishment or abandonment of a known right or privilege." *Id.* at 161-62. A waiver of this right may not be presumed by a silent record. *Id.* at 162.

In order to ensure that defense attorneys do not make unilateral decisions regarding a defendant's right to testify, the Tennessee Supreme Court implemented the following procedures:

> At any time before conclusion of the proof, defense counsel shall request a hearing, out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify. This hearing shall be placed on the record and shall be in the presence of the trial judge. Defense counsel is not required to engage in any particular litany, but counsel must show at a minimum that the defendant knows and understands that:
>
> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
>
> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;
>
> (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Momon*, 18 S.W.3d at 162. The *Momon* court recognized that "[d]efense counsel is generally in the best position to voir dire the defendant." 18 S.W.3d at 162. Thus, "[u]nder normal circumstances, the trial judge should play no role in this procedure." *Id.* The court further noted that this approach, which minimizes judicial interference, strikes the proper balance between the preservation of a confidential right and the need to protect the relationship and confidences between counsel and client. *Id.* Defense counsel and trial courts "should adhere to these procedural guidelines in all cases

-21-

tried or retried after the date of this decision." *Id.* at 163. The court noted, however, that the "procedures are prophylactic measures which are not themselves constitutionally required." *Id.* at 163. And, the failure to follow the *Momon* guidelines will not alone support a claim for deprivation of the constitutional right to testify if there is evidence in the record to establish that the right was otherwise personally waived by the defendant. *Id.*

Appellant Rimmer's argument contesting the validity of the waiver of his right to testify focuses upon the failure of the record to demonstrate that he was advised of the limited privilege against self-incrimination, *i.e.*, an ability to testify about mitigating circumstances and not be cross-examined about the facts and circumstances of the murder unless he opens the door.[4] *See Cazes,* 875 S.W.2d at 266. Appellant Rimmer took the stand and was questioned by defense counsel regarding his decision to testify on his own behalf. The following colloquy occurred:

[Counsel for Appellant]: Mr. Rimmer, do you understand that all of the proof that has been prepared by the defense has been submitted in this case?

[Michael Rimmer]: Yes, sir, I do . . . .

[Counsel for Appellant]: Do you know that the state has rested it's [sic] case and have no other proof, unless they decide to put on some rebuttal proof?

[Michael Rimmer]: Yes, sir.

[Counsel for Appellant]: You know that we are now to the point where you have to make a decision as to whether you want to take the witness stand on your own behalf?

[Michael Rimmer]: Yes, sir, I understand that.

[Counsel for Appellant]: And that is a subject that we have discussed from time to time, throughout this trial; is it not?

[Michael Rimmer]: Yes, sir, quite a bit.

[Counsel for Appellant]: And when I say, "we", I'm talking about myself and Mr. Springer, who is my co-counsel . . . , and you, in and out of the courtroom we have talked about your right to take the stand on your own behalf?

---

[4] In *Cazes*, our supreme court recognized that due to the gravity of a capital sentencing hearing and the constitutional mandate to ensure that all relevant mitigating circumstances be presented to the sentencing body "a capital defendant's testimony regarding mitigating factors that are wholly collateral to the merits of the charges against him does not operate as a complete waiver of the privilege against self-incrimination. *Cazes*, 875 S.W.2d at 266. In other words, a defendant has a right to limited cross-examination if he wishes to testify about only collateral mitigating circumstances at the penalty phase of a capital trial. *Id.*

[Michael Rimmer]:                     Yes, sir.

[Counsel for Appellant]:        We have informed you that you have a Constitutional right to take the stand and testify on your own behalf, if you decided to do so?

[Michael Rimmer]:                     Yes, sir, I do.

[Counsel for Appellant]:        You also know that you have a Constitutional right not to take the witness stand, because the law says that you can't be made to be a witness against yourself?

[Michael Rimmer]:                     Yes, sir, I do.

[Counsel for Appellant]:        And if you decide not to take the witness stand, that the Judge. . . will instruct the jury that they cannot consider that as evidence against you in this case, because you're standing on your Constitutional rights?

[Michael Rimmer]:                     Yes, sir, I'm aware of that.

[Counsel for Appellant]:        Have you, at this time, Mr. Rimmer, made a decision as to whether you would like to take the stand and testify on your own behalf?

[Michael Rimmer]:                     Yes, sir, I have made that decision. . . .  The burden of proof is on the state, it is not on me, so therefore I am not going to take the stand in this trial, Your Honor.

[Counsel for Appellant]:        You've decided not to testify?

[Michael Rimmer]:                     Yes, sir.  The burden of proof is on the state.

. . .

The trial court then informed the Appellant that the decision to testify was an individual decision and asked whether he had been pressured or coerced in any way regarding his decision not to testify. Appellant Rimmer responded, "this is of my own free will, my own accord."

The colloquy between the Appellant and trial counsel reveals that Mr. Rimmer was questioned regarding his decision to testify.  He was informed that he had a right to testify and that he had a right not to testify if he so chose.  Appellant Rimmer responded that the burden of proof was on the State and not him and that he would not take the stand and testify.  He further stated that he had not been pressured or coerced in any way regarding his decision.  Appellant Rimmer also agreed that he had discussed the decision to testify with his trial attorneys on numerous occasions throughout the course of the trial.

Based upon the record, this Court declines to adopt the Appellant's attempt to expand the *Momon* requirements. Nothing in *Momon* requires either defense counsel or the trial court to advise the defendant of every possible factor that could necessarily result from his decision to testify or his decision not to testify, including the permissible scope of cross-examination. Moreover, there is no indication in the record that Appellant Rimmer failed to understand the consequences of his decision not to testify. Again, the record reflects that Appellant Rimmer's decision not to testify was based, in large part, upon his assertion that he did not bear the burden of proof; rather, the burden of proof rested with the State. The Appellant was informed that the State's case had concluded and that defense counsel had presented all the evidence that they had prepared in mitigation. We reject the Appellant's argument that he was not sufficiently advised of the salient consequences of exercising his fundamental constitutional right to testify. We further conclude that the record reflects that Appellant Rimmer's waiver of his constitutional right was voluntarily, knowingly and intelligently made. Appellant Rimmer is not entitled to relief on this claim.

### VII. Revelation to Jurors that Appellant had been on Death Row

Appellant Rimmer argues that the revelation to the jury that he was a death row inmate and, thus, had been sentenced to death by a previously empaneled jury constitutes plain error as it violated his right to a reliable non-arbitrary sentencing determination.[5] The information complained of was elicited during the direct examination of the Appellant's mitigation witness, Thomas Mach. Specifically, the record reveals the following references to the Appellant's previous death sentence:

[Counsel for Appellant]:     And how is it that you know Mr. Michael Rimmer?

[Thomas Mach]:     I visited him in prison. I'm involved in prison ministry at Riverbend.

. . . .

[Counsel for Appellant]:     Now, you stated you met Michael while he was on death row?

[Thomas Mach]:     Yes, sir.

[Counsel for Appellant]:     And how would you describe his interest in the services and the worship services?

[Thomas Mach]:     Michael's done amazing things in unit four. When he was taken off of death row and went to unit four, . . . he got eighteen men interested in the [B]ible. . . .

---

[5] Appellant Rimmer acknowledges that no objection to the information was made at trial as the information was largely elicited by defense counsel. He further concedes that the issue was not raised in the Appellant's motion for new trial. In this regard, Appellant invokes the "no waiver" rule in capital cases.

The following colloquy occurred on cross-examination of this witness:

[Prosecutor]:                    How long have you known the defendant in prison?

[Thomas Mach]:              Since I met him on death row.

In contesting the introduction of the fact that he had previously been on death row, Appellant Rimmer asserts that "making known to the jury that a defendant had previously been sentenced to death for the same crime by a different jury will also affect the jury's deliberations, if for no other reason than it would seem to suggest that because another jury concluded that death was the appropriate sentence the present jury should as well." In this regard, he asserts that the reliability of the jury's verdict and sentence was diminished by the knowledge that another jury had sentenced him to die for the same offense that was under consideration at the resentencing hearing.

The United States Supreme Court has held that the introduction, during the sentencing phase, of evidence of a prior death sentence is not constitutional error, so long as the evidence does not affirmatively mislead the jury and diminish its sense of sentencing responsibility. *Romano v. Oklahoma,* 512 U.S. 1, 10, 114 S.Ct. 2004 (1993). In *Romano,* the defendant was found guilty of murder, and during the subsequent penalty phase, the prosecution introduced evidence of a previous conviction and death sentence. The defendant argued that the admission of the prior death sentence undermined the jury's sense of responsibility for determining the death penalty in violation of the Eighth Amendment. In rejecting the defendant's argument, the Supreme Court stated, "We do not believe that the admission of evidence regarding petitioner's prior death sentence affirmatively misled the jury regarding its role in the sentencing process so as to diminish its sense of responsibility." *Id.* at 10, 114 S. Ct. at 2010; *see also State v. Bell,* 302 S.C. 18, 24, 393 S.E.2d 364, 368, *cert. denied,* 498 U.S. 881, 111 S. Ct. 227(1990) ("[W]e also reject Bell's argument that the jurors' knowledge of the previous death sentence diminished their sense of responsibility in deciding what sentence to impose."). Accordingly, the relevant inquiry that this Court must consider is whether the admission of evidence regarding the Appellant's prior death sentence so infected the sentencing process with unfairness as to render the jury's imposition of the death penalty a denial of due process.

After review of the record, we conclude that Appellant Rimmer has not established how this passing reference to "death row" misled the jury regarding its role in the sentencing process or diminished its sense of responsibility. In reaching this conclusion, this Court is cognizant that the reference to death row was elicited by the Appellant on direct examination of his mitigation witness. Appellant Rimmer cannot assert as error an act or omission to which he contributed or in which he participated in such fashion. Tenn. R. App. P. 36(a). Also, the trial court properly instructed the jury as to the applicable law. We presume that the jury followed the trial court's instruction. Applying these facts, this Court holds that passing references to the fact that the Appellant was previously on death row did not corrupt his constitutional guarantee to a fair re-sentencing jury. The Appellant is not entitled to relief on this issue.

### III.  Jury Verdict

Appellant Rimmer contends that the jury verdict is incomplete as it fails to contain a finding that the aggravating circumstance was proven beyond a reasonable doubt.  In support of his argument, Appellant Rimmer quotes the verdict form as follows:  "We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances."  He asserts that the failure to reflect that the aggravating circumstance was found beyond a reasonable doubt violates his state and federal constitutional rights, including that the verdict form permitted the sentence of death to be imposed on a lower burden of proof than required by statute.

Our supreme court rejected the identical argument in *State v. Faulkner,* 154 S.W.3d 48 (Tenn. 2005).  Our supreme court, in doing so, concluded:

> The verdict form incorporated the language of Tennessee Code Annotated section 39-13-204(g)(1)(B) (1997), which provides: "We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances . . . ." The statutory form also omits the burden of proof for establishing aggravating circumstances.

> Regardless of waiver, a similar issue was rejected by this Court recently in *State v. Davidson,* 121 S.W.3d 600, 619-20 (Tenn. 2003).  We concluded that such an error can be distinguished from the reversible error in the verdict form in *State v. Carter,* 988 S.W.2d 145, 152 (Tenn. 1999). *See Davidson,* 121 S.W.3d at 620. In *Carter,* the wrong form was used, and the form was not merely silent as to the burden or proof but conflicted with the trial court's instructions regarding the burden. Like *Davidson,* the language used in the verdict form in the present case was statutorily mandated, and the trial court repeatedly and clearly instructed the jury that it must find any statutory aggravating circumstances beyond a reasonable doubt. We conclude, therefore, that the failure of the verdict form to recite that the jury found the aggravating circumstance "beyond a reasonable doubt" did not render the verdict invalid.

*Faulkner*, 154 S.W.3d at 61-62.  Applying the *Faulkner* holding to the facts before this Court, we conclude that the Appellant is not entitled to relief on this issue.

### IX.  Cumulative Error

Appellant Rimmer, reciting the litany of his alleged errors, asserts that this Court should not consider in isolation any errors that this Court would deem harmless.  He asserts that "individually and in combination the foregoing errors resulted in an arbitrary and unreliable imposition of the death penalty." Because our review of the individually assigned error has concluded errors are either without merit or harmless, the Appellant's argument of cumulative error is likewise without merit.

## X.  Constitutionality of Death Penalty

Appellant Rimmer next raises numerous challenges to the constitutionality of Tennessee Code Annotated sections 39-13-204 and 39-13-206.  Specifically, Appellant Rimmer argues that (A) the death sentence is imposed capriciously and arbitrarily;  (B) the appellate review process in death penalty cases is constitutionally inadequate; and (C) lethal injection is cruel and unusual punishment.

### A.  The Death Sentence Is Imposed Capriciously and Arbitrarily

Appellant Rimmer argues that the death sentence is imposed capriciously and arbitrarily because (1) the jury is required to unanimously agree to a life verdict in violation of *McKoy v. North Carolina,* 494 U.S. 433, 110 S. Ct. 1227 (1990), and *Mills v. Maryland,* 486 U.S. 367, 108 S. Ct. 1860 (1988); (2) unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty; and (3) the death penalty is imposed in a discriminatory manner based upon race, geography, and gender. Our supreme court has rejected each of these arguments. *See Hines,* 919 S.W.2d at 582; *State v. Brimmer,* 876 S.W.2d 75, 87 (Tenn. 1994); *Cazes,* 875 S.W.2d at 268; *State v. Smith,* 857 S.W.2d 1, 23 (Tenn. 1993); *State v. Thompson,* 768 S.W.2d 239, 250-52 (Tenn. 1989). These claims are without merit.

### B.  The Appellate Review Process in Death Penalty Cases Is Constitutionally Inadequate

The Appellant also contends that the appellate review process in death penalty cases is constitutionally inadequate. Specifically, the appellant contends that the review process is not "meaningful" and that the statutorily mandated proportionality review violates due process.  Both arguments have been rejected by our supreme court. *See Vann,* 976 S.W.2d at 118-19; *Cazes,* 875 S.W.2d at 270-71.  Moreover, our supreme court has held that, "[w]hile important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." *State v. Bland,* 958 S.W.2d 651, 663 (Tenn. 1997).  Accordingly, Appellant Rimmer is not entitled to relief on this claim.

### C.   Lethal Injection is Cruel and Unusual Punishment

Appellant Rimmer contends that lethal injection constitutes cruel and unusual punishment because the use of Pavulon with sodium pentothal and potassium chloride creates a risk of unnecessary physical and psychological suffering and because the lethal injection protocol lacks written provisions or other appropriate safeguards.  Our supreme court has recently rejected these claims in *Abu-Ali Abdul 'Rahman v. Bredesen*, 181 S.W.3d 292, 307-310 (Tenn. 2005).  While Appellant acknowledges this ruling, he makes specific challenges as to the validity of our supreme court's reasoning.  We, as an intermediate appellate court, are bound by the decisions of the Tennessee Supreme Court as to state and federal constitutional questions. *State v. Pendergrass*, 13 S.W.3d 389, 397 (Tenn. Crim. App. 1999).   Thus, we decline the Appellant's invitation to revisit this claim.

## XI.  Review Pursuant to Section 39-13-206(c), Tennessee Code Annotated

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), we are required to review the application of the death penalty to determine whether

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

## A. Arbitrariness

Having thoroughly reviewed the record, we conclude that the sentence of death was not imposed in any arbitrary fashion.

## B. Sufficiency of Statutory Aggravating Circumstances Found by Jury

In imposing the death penalty, the jury found the proof supported the (i)(2), prior violent felony, aggravating factor relied upon by the State. *See* T.C.A. § 39-13-204(i)(2). During the penalty phase, the State presented proof that the Appellant was convicted in 1985 of assault with intent to commit robbery with a deadly weapon and aggravated assault. The proof further revealed that, in 1989, the Appellant entered guilty pleas to aggravated assault and rape. The jury's verdict reflects that it found that the State had proven the presence of the prior violent felony conviction aggravating factor. The record supports this finding. We conclude that the State's evidence was sufficient to establish the (i)(2) aggravating circumstance. *See* T.C.A. § 39-13-204(i)(2).

## C. Totality of Aggravating Factors Applied

With consideration of the evidence before the jury, we conclude that the evidence supports the jury's finding that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.

## D. Proportionality

This Court is required by Tennessee Code Annotated section 39-13- 206(c)(1)(D) and under the mandates of *Bland,* 958 S.W.2d at 661-74, to consider whether the Appellant's sentence of death is disproportionate to the penalty imposed in similar cases. *See State v. Godsey,* 60 S.W.3d 759, 781-82 (Tenn. 2001). The comparative proportionality review "is designed to identify aberrant, arbitrary, or capricious sentencing." *State v. Stout,* 46 S.W.3d 689, 706 (Tenn. 2001). It does this by determining whether the death penalty in a given case is "'disproportionate to the punishment imposed on others convicted of the same crime.'" *Bland,* 958 S.W.2d at 662 (quoting *Pulley v. Harris,* 465 U.S. 37, 43, 104 S. Ct. 871, 876 (1984)). If a case is "'plainly lacking in circumstances

consistent with those in cases where the death penalty has been imposed,' then the sentence is disproportionate.'" *Stout,* 46 S.W.3d at 706 (quoting *Bland,* 958 S.W.2d at 668).

In conducting our proportionality review, this court must compare the present case with cases involving similar defendants and similar crimes. *See id.; see also Terry v. State,* 46 S.W.3d 147, 163-64 (Tenn. 2001). We select only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. *See State v. Carruthers,* 35 S.W.3d 516, 570 (Tenn. 2000); *see also Godsey,* 60 S.W.3d at 783.

This Court begins with the presumption that the sentence of death is proportionate with the crime of first degree murder. *See Terry,* 46 S.W.3d at 163 (citing *State v. Hall,* 958 S.W.2d 679, 699 (Tenn. 1997)). This presumption applies only if the sentencing procedures focus discretion on the "particularized nature of the crime and the particularized characteristics of the individual defendant." *Id.* (quoting *McCleskey v. Kemp,* 481 U.S. 279, 308, 107 S. Ct. 1756, 1775 (1987) (quoting *Gregg v. Georgia,* 428 U.S. 153, 206, 96 S. Ct. 2909, 2940-41 (1976))).

Applying this approach, in comparing this case to other cases in which a defendant was convicted of the same or similar crime, this Court looks "at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved." *See Terry*, 46 S.W.3d at 164. Regarding the circumstances of the crime itself, numerous factors are considered, including the following: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of provocation; (7) the absence or presence of premeditation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. *Stout,* 46 S.W.3d at 706; *see also Terry,* 46 S.W.3d at 164. Contemplated within the review are numerous other factors, including the Appellant's "(1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *Stout,* 46 S.W.3d at 706; *Terry,* 46 S.W.3d at 164. In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." *Terry,* 46 S.W.3d at 164. Thus, our function is not "to limit our comparison to those cases where a defendant's death sentence 'is perfectly symmetrical,' but only to 'identify and to invalidate the aberrant death sentence.'" *Id.* (quoting *Bland,* 958 S.W.2d at 665).

Turning to the instant case, we first acknowledge that a sentence of death has been upheld where the defendant killed an estranged wife or girlfriend. *See, e.g., State v. Ivy*, 188 S.W.3d 132 (Tenn. 2006) (defendant ambushed estranged girlfriend shooting her five times at close range); *Faulkner*, 154 S.W.3d at 148 (defendant beat estranged wife to death with iron skillet); *State v. Keough,* 18 S.W.3d 175 (Tenn. 2000) (defendant stabbed estranged wife to death after argument; death penalty affirmed based on (i)(2) aggravating circumstance); *State v. Hall,* 8 S.W.3d 593 (Tenn. 1999) (defendant strangled estranged wife to death after assault on her person; death penalty affirmed based on (i)(5) aggravating circumstance); *State v. Smith,* 868 S.W.2d 561 (Tenn. 1993) (defendant

shot estranged wife, slit her throat and stabbed her multiple times; death sentence upheld based upon (i)(5) and (i)(12); *State v. Johnson,* 743 S.W.2d 154 (Tenn. 1987) (defendant suffocated wife; death penalty affirmed based upon (i)(2) and (i)(5) aggravating circumstances); *State v. Miller,* 674 S.W.2d 279 (Tenn. 1984), *on remand,* 771 S.W.2d 401 (Tenn. 1989) (defendant beat girlfriend to death with fists and fire poker, he then stabbed her numerous times; death penalty upheld under (i)(5) aggravating circumstance).

The death sentence has been upheld based on the sole aggravating circumstance of a prior violent felony conviction, T.C.A. § 39-13-204(i)(2). *See, e.g., State v. McKinney,* 74 S.W.3d 291 (Tenn. 2002) (prior conviction for aggravated robbery as adult and aggravated assault as juvenile); *State v. Chalmers,* 28 S.W.3d 913 (Tenn. 2000) (prior convictions for attempted especially aggravated robbery and attempted first degree murder); *Keough,* 18 S.W.3d 184 (prior convictions for assault with intent to commit voluntary manslaughter and manslaughter); *State v. Smith,* 993 S.W.2d 6 (Tenn. 1999) (prior convictions for robbery and first degree murder); *State v. Boyd,* 959 S.W.2d 557 (Tenn. 1998); *State v. Adkins,* 725 S.W.2d 660 (Tenn. 1987) (prior conviction for aggravated assault). The prior violent felony factor is an aggravating circumstance that the courts of this state have described as "more qualitatively persuasive and objectively reliable than others." *McKinney,* 74 S.W.3d at 313; *State v. Howell,* 868 S.W.2d 238, 261 (Tenn. 1993).

In completing our review, we need not conclude that this case is exactly like prior cases in every respect, nor must this Court determine that this case is "more or less" like other death penalty case. Rather, this Court need only identify "aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld." *Ivy*, 188 S.W.3d at 158. The penalty imposed by the jury in the present case is clearly not disproportionate to the penalty imposed for similar crimes.

## Conclusion

In accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1), Tennessee Code Annotated, and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this capital case and determine that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports the jury's finding of the statutory aggravating circumstance, and that the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt. T.C.A. § 39-13-206(c)(1)(A)-(C). A comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. We conclude that no error exists requiring reversal. Accordingly, the sentence of death is affirmed.

_____
DAVID G. HAYES, JUDGE